Filed 12/12/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S058019 |
| v. | ) | |
| | ) | |
| GEORGE LOPEZ CONTRERAS, | ) | |
| | ) | Tulare County |
| Defendant and Appellant. | ) | Super. Ct. No. 37619 |
| _____ | ) | |

A Tulare County jury convicted George Lopez Contreras (defendant) of robbing and murdering a storeowner, Saleh Bin Hassan (Hassan). Defendant was found guilty, as charged, of first degree felony murder (Pen. Code, § 187, subd. (a))[1], and of robbery (§ 211). The jury also sustained a special circumstance allegation of murder in the commission of a robbery. (§ 190.2, subd. (a)(17) (section 190.2(a)(17).) Defendant was found to have personally used a firearm (shotgun) in committing each crime. (§§ 1192.7, subd. (c)(8), 1203.06, subd. (a)(1), 12022.5, subd. (a).)

After a penalty trial, the same jurors who had decided guilt fixed the penalty at death. The trial court denied defendant's automatic motion to modify

---

[1]    All further unlabeled statutory references are to the Penal Code except as otherwise stated.

the penalty verdict. (§ 190.4, subd. (e).) The court pronounced a death judgment for the special circumstance murder. Sentence also was imposed for the robbery count and related firearm-use finding. This appeal is automatic. (Cal. Const., art. VI, § 11, subd. (a); § 1239, subd. (b).)

We find no prejudicial error at defendant's trial. The judgment will be affirmed in its entirety.

## I. GUILT PHASE EVIDENCE

### A. Summary

Prosecution evidence showed that Hassan was killed on December 29, 1994, while working at the Casa Blanca Market, which he and his wife owned in Farmersville, near Visalia. He had been shot twice, including once in the back. His dead body was lying prone behind the counter. Nothing was missing from the cash register. However, Hassan's wallet and handgun were gone. Defendant was implicated in the crime along with three other men: Jose Gonzalez (Jose), Santos Acevedo Pasillas (Santos), and Louis Phillip Fernandez, Jr. (Louis). Defendant carried a shotgun into Hassan's store, and was identified as the actual killer. At the outset, criminal charges were jointly filed against all four men. Severance was later granted, and defendant was tried alone. The jury returned a guilty verdict, as stated above.

### B. Prosecution Case-in-Chief

#### 1. *Testimony of witnesses present during the capital crime*

A key witness was Jose Guadalupe "Lupe" Valencia (Lupe). At the relevant time, Lupe lived with both his sister, Yesenia Valencia, and her

2

boyfriend, Jose. Jose introduced Lupe to defendant shortly before the capital crime.[2]

In December 1994, when Lupe had nothing to do, he went with Jose and defendant to pick up the other alleged accomplices, first Louis and then Santos. When Louis joined the group, they used his car.

Lupe described an unusual event that happened when the group picked up Santos that day. Defendant and Santos brought two "long rifles" from the house, and set them in the back seat of Louis's car. Louis was the driver, and Lupe was the front passenger. The other three men — defendant, Jose, and Santos — sat in the back on top of the guns.

Louis drove the group to a store in Visalia. Lupe did not know the store's name. However, he recalled that on the way there, defendant, Jose, and Santos put on makeshift masks. These masks were made of small pieces of cloth, and covered each man's face from the nose down. Because of the masks and guns, Lupe assumed the group planned to rob the store. However, the car did not stop, and no robbery occurred, because there were too many people nearby.

Lupe's account continued: Louis drove to another spot, the Casa Blanca Market, in Farmersville. Santos said he wanted to see if anyone was inside the store. With the mask hanging around his neck, he exited the car and pretended to use the pay phone near the door. Santos returned to the car and said the store was empty. Defendant and Jose each responded by grabbing a gun and going inside.

---

[2]     Lupe's age is not clear from the trial record. However, as shown below, the defense elicited on cross-examination that Lupe attended high school starting at some point before December 1994, when the capital crime occurred, and continuing through September 1996, when he testified at trial.

About 20 seconds later, Lupe heard a loud gunshot.  He testified that Santos reentered the car after "running out saying that George [i.e., defendant] got shot."  Louis made a U-turn, apparently preparing to drive away.  At some point, both Jose and defendant, who had not been shot, joined the trio already inside the car.

Lupe testified that Louis drove the group to Santos's home.  On the way, defendant said he would "never forget the smile on his face," an apparent reference to the victim, Hassan.  Lupe recalled that defendant was smiling and in a "happyish" mood.  At Santos's house, Louis dropped off his passengers and left.  Later, defendant accompanied Lupe and Jose to their home.

At trial, Lupe described certain conversations that night which implicated both Jose and defendant in the robbery murder.  According to Jose, the clerk at the store displayed a gun.  Jose said he attempted to shoot the clerk but his gun jammed.  Jose stated that he tried breaking into the cash register, which did not open, and he took the clerk's wallet.  After giving this account, Jose showed the wallet to Lupe.[3]

Defendant incriminated himself on the same occasion.  First, he offered Lupe a handgun, which Lupe did not take.  Lupe identified the handgun that belonged to the victim, Hassan, as the one defendant displayed.

---

[3]    Lupe's testimony about Jose was corroborated, in part, by Lupe's sister, Yesenia.  She testified that Jose was her boyfriend at the time of the capital crime and at trial.  They had a child together.  According to Yesenia, Jose admitted that he entered the Casa Blanca Market to commit a robbery, and that "they had killed a man" inside.  Jose denied having a weapon inside the store.  Jose showed Yesenia a wallet, and said it came from the clerk.  The last time Yesenia saw the wallet was when Jose was arrested in August 1995.  The police took the wallet at that time.  Both Lupe and Yesenia identified the wallet seized by the police as the one Jose had shown them and used after the capital crime.

4

Second, Lupe testified that defendant said that "when he walked in, he pointed the gun at the clerk and the clerk pulled out a gun and [defendant] shot him." Defendant promised to "get" any informers. Lupe assumed that this threat was aimed at him, and that it meant defendant would "shoot [him] or something."

Like Lupe, another witness, Amanda Garcia, saw events outside the Casa Blanca Market on the day of the capital crime. At 3:00 p.m., she drove from the Kmart in Visalia towards Farmersville, where she lived. Around 3:30 p.m. or 4:00 p.m., Garcia encountered a car she identified as Louis's car blocking traffic outside the market. She stopped five or six car lengths behind the car, and saw two people inside — one in the driver's seat and the other in the backseat. Suddenly, two other individuals rushed out of the store. One of them carried a long object shaped like a gun. Each person leaving the store wore a dark mask that covered the face except for the eyes. Garcia saw a similar disguise on one of the occupants of the car in front of her, after that person turned around in her direction. The pair on foot got into the waiting car, which sped away.

### 2. *Testimony of Artero Vallejo, Jr., and supporting witnesses*

In 1994, Artero Vallejo, Jr. (Vallejo) was friends with defendant and Santos. Vallejo testified that on December 29, the day of the capital crime, he worked his regular swing shift in Visalia, which began at 3:00 p.m. and ended between 11:00 p.m. and 11:30 p.m. After work, Vallejo went to Santos's house. Both defendant and Santos were there.[4]

---

**4** Vallejo's supervisor, Walter Cypert, confirmed at trial that, on December 29, 1994, Vallejo punched his time card at 2:55 p.m., when his shift began, and punched it again at 11:03 p.m., when the shift ended.

Vallejo testified about incriminating statements Santos, defendant, and Jose made the night of the capital crime. Santos told Vallejo that "[t]hey tried to pull a little robbery," that a "shooting" occurred, and that they got "nothing out of it."

According to Vallejo, defendant volunteered that he "shot the clerk at the store," and that the shooting occurred as follows: Defendant held the shotgun in one hand. The clerk offered no cash, and none could be found. Defendant warned the clerk that he would be shot if he did anything. Defendant ended up shooting him. Defendant then approached the wounded man and saw a smile on his face. Defendant said, "I told you I was going to kill you." Defendant kicked the clerk and shot him a second time. Vallejo testified that, in recounting the crime, defendant acted like "it was no big deal." [5]

During the same conversation, defendant admitted taking a .25-caliber handgun from the store clerk. Defendant pulled the gun from his jacket pocket and showed it to Vallejo. At trial, Vallejo identified Hassan's gun as the one that defendant had displayed.[6]

---

[5]    Defense questioning revealed that Santos spoke to Vallejo a second time on an uncertain date *after* December 29, 1994. Santos reportedly said during the second conversation that defendant's infant son, Marco, was in the getaway car with Louis outside the Casa Blanca Market. In addition, without identifying the source of such information, Vallejo testified that he understood that Santos, not Jose, wielded the .22-caliber rifle inside the store and watched the back area. Either way, Vallejo consistently maintained at trial that, to his knowledge, defendant shot Hassan twice with the shotgun.

[6]    The handgun that defendant showed to both Lupe and Vallejo was discovered shortly after the capital crime in the possession of defendant's brother, Fernando Contreras. Officer Jeff McIntosh of the Visalia Police Department testified that on January 9, 1995, he encountered Fernando sitting in a stolen truck "[r]ight next door" to his Visalia home. McIntosh detained Fernando, performed a patdown search, and found a loaded .25-caliber handgun in his pants pocket. At trial, McIntosh identified Hassan's handgun as the one he took from Fernando. Two other witnesses, Police Officer Gary James and defendant's mother Maria

*(footnote continued on next page)*

Vallejo testified about other guns that linked defendant to the Casa Blanca crimes, as follows: When defendant needed guns, he would borrow them from Jesus Manuel Fernandez, or "Shorty" (Shorty). One or two weeks before the capital crime, Vallejo went with defendant and Santos to Shorty's home and borrowed a shotgun and a .22-caliber rifle. Later, on December 28, the night before the murder, Vallejo was told by either defendant or Santos that defendant had picked up the same guns at Shorty's house earlier that day.[7] The purpose was to "pull a little job," which Vallejo understood to mean an armed robbery, and to get some quick cash. Shorty's wife transferred the weapons at that time.[8]

Vallejo's testimony also encompassed his contact with the other perpetrators, Jose and Louis, the night that Hassan was killed. Specifically, Jose and Louis arrived at Santos's house while defendant, Santos, and Vallejo were there. According to Vallejo, Jose discussed events inside the Casa Blanca Market.

---

*(footnote continued from previous page)*

Contreras Lopez, testified that in December 1994 and January 1995, defendant and Fernando both lived with their mother at the same address — the one adjacent to where Hassan's gun was recovered from Fernando.

[7] Shorty testified at trial consistently with Vallejo's account, as follows: Shorty and defendant were good friends who sometimes went hunting together with Shorty's guns — a 12-gauge shotgun and a .22-caliber rifle. Other times, Shorty loaned the guns to defendant for his own use. Defendant usually returned them within two days. Around Christmas 1994, defendant and Santos borrowed the shotgun and rifle. They picked them up from Shorty's wife with Shorty's permission. But this time, unlike before, defendant did not return the weapons. He told Shorty that Santos lost them.

[8] Shorty's wife, Mariela Fernandez, testified that she once lent both of her husband's long guns to defendant. Though she was uncertain of the date, the transaction might have happened around November, a "long time" before trial. Mrs. Fernandez recalled defendant being accompanied by at least one other person, Santos.

7

Jose told Vallejo that "George [i.e., defendant] had shot him [i.e., the clerk], that he [apparently, Jose] couldn't find the money, and that he said he was looking all over the place for the money."

Vallejo further testified that all five men left Santos's house together that night. After stopping briefly at Louis's house, the group went out to "celebrate" the shooting. They visited a bar named The Break Room, and then attended a party in Farmersville. Vallejo testified that he and his companions each drank alcohol at both places, and that they also ingested "crank," or methamphetamine, at the party. The group eventually split up. Santos and Louis went home, and defendant, Jose, and Vallejo attended a second party.

Vallejo denied being present at the Casa Blanca Market during the robbery murder or otherwise having any involvement in the crime.

### 3. *Postcrime investigation*

At 3:27 p.m. on December 29, 1994, Deputy Scott O'Neill of the Tulare County Sheriff's Department was dispatched to the Casa Blanca Market. When he arrived a few minutes later, he found Hassan, dead, behind the cash register. His body was lying facedown on the floor. Based on witness statements at the scene, O'Neill estimated that the crime happened at 3:20 p.m.[9]

The autopsy physician, Dr. Leonard Miller, testified that Hassan sustained two fatal gunshot wounds. One shot had penetrated the left side of the victim's

---

**9**    A sheriff's detective, James Schwabenland, was called to the crime scene at 3:40 p.m. on December 29, 1994. He took photographs and collected physical evidence. Almost no useable fingerprints were found in the store — a scenario that Schwabenland testified was common in public places. The only exceptions were the victim's fingerprint, which was found on a cigarette pack, and another unidentified fingerprint left on a soda can.

8

abdomen. The other shot had entered his lower back, toward the right side of the body. Each wound was inflicted with a shotgun.

Sheriff's Detective James Hilger investigated the Casa Blanca Market crimes. They went unsolved for several months. The situation changed in August 1995. At that time, under circumstances discussed further below, Vallejo voluntarily contacted law enforcement officials. He offered to provide information about the killing and to identify the perpetrators. On August 11, Detective Hilger tape-recorded Vallejo's statement. Defendant apparently was arrested the same day.

A short time later, law enforcement officials contacted Lupe. For the first time, he disclosed what he knew about the capital crime.[10]

## C. Defense Case

Defendant called two witnesses who were outside the Casa Blanca Market the day of the capital crime. Byron Northcutt, who lived one block away, testified that he heard three gunshots, and saw a man with a rifle leave and then reenter the store. Two men then left the store, led by the one with the rifle. They entered a waiting car. Both wore hoods. Northcutt could not tell if the second man had a gun. The second defense witness, Joel Mohr, was repairing a car 50 yards away when he saw one man leave the store, yelling at someone inside to hurry. A second man, wearing a hood, came out, stood in the driveway, and shot toward the store. At most, Mohr heard two shots. He did not see whether the first man had a

---

[10] In response to questioning by the prosecutor, Lupe testified that, before trial, he signed an agreement with the district attorney's office to testify truthfully in exchange for avoiding prosecution for his presence outside the Casa Blanca Market at the time of the robbery murder.

9

gun or hood. Mohr watched the men enter a car that had been parked near the pay phone and that swung around to meet them. Two other men were in the front seat.

The defense also elicited testimony from Detective Hilger to the effect that certain details in Vallejo's pretrial taped statement did not match his trial testimony. For instance, in the police interview, Vallejo said that when he arrived at Santos's house after work on the night of the capital crime, Jose was already there with defendant and Santos. However, Vallejo testified at trial that he arrived before both Jose and Louis.

The rest of the defense case consisted of an alibi for the Casa Blanca crimes. It was offered by the following members of defendant's family: Claudia Gutierrez Contreras, who was defendant's girlfriend in December 1994 and his wife at the time of trial; Claudia's sisters, Erika Gutierrez and Patricia Murillo; Patricia's husband, Raul Murillo; and Martina Gutierrez, the mother of Claudia, Erika, and Patricia.

Together, these witnesses (whom we identify by their first names) testified as follows: Defendant picked up Claudia after she left work at 3:36 p.m. on December 29, 1994. After stopping at Claudia's house, defendant and Claudia went to pick up Claudia's sister, Erika, at the accounting firm in Visalia for which she worked. Defendant and Claudia — who had defendant's infant son, Marco, in the car — waited 45 minutes in the parking lot until Erika left work.[11]

---

**11** Defendant's son, Marco, turned one year old in mid-December 1994. His mother is Arcadia Hernandez, with whom defendant was involved while temporarily estranged from Claudia. Defendant and Arcadia have a second child Jasmine, who was born in February 1995, shortly after the capital crime. In December 1994 and January 1995, defendant lived in his mother's home, and Arcadia lived elsewhere with her family. Members of defendant's family testified that defendant had physical custody of Marco in December 1994, including the

*(footnote continued on next page)*

10

Meanwhile, Erika looked out of an office window and recognized two couples in the parking lot: (1) defendant and Claudia, and (2) Patricia and Raul. Each couple waved at the other. Patricia and Raul had arrived there around 4:00 p.m. to obtain a personal loan from a finance company in Erika's office building.[12] After Erika left work at 5:00 p.m., defendant drove Claudia and Erika home. He did not leave their house before midnight.

Claudia testified that in January 1996, one year after the killing and five months after defendant's arrest in August 1995, she found the written loan agreement that Patricia and Raul had signed on December 29, 1994. This information was passed along to Erika, Patricia, and Martina. These family members testified that the contract helped them recall defendant's whereabouts when it was signed.

### D. Prosecution Rebuttal

The prosecution challenged the defense theory that, shortly after the Casa Blanca Market crimes, defendant was in a car with his infant son, Marco, and with Claudia, meeting Claudia's sister, Erika, after work. As noted, Marco's mother is Arcadia Hernandez (Arcadia). Arcadia's sister, Elisabeth Hernandez (Elisabeth), testified that throughout December 1994, Marco stayed with Arcadia and

---

*(footnote continued from previous page)*

week between Christmas and New Year's Day. The prosecution contested the latter point on rebuttal, as discussed below.

[12] Isaac Perez testified that he worked for the finance company from which Patricia and Raul obtained their loan, and that he met with them the day they signed the contract, December 29, 1994. On cross-examination, Perez noted that no time of day appeared on the contract, and that he had no memory in that regard. The loan signing could have occurred anytime in the afternoon, most likely between 2:00 p.m. and 4:30 p.m.

Elisabeth in their mother's home, and that he was not visited or taken by defendant during this time.**13**

### E. Defense Surrebuttal

Claudia (defendant's girlfriend in 1994 and his wife at trial) testified that a photograph depicting defendant with her and Marco was taken around Christmas, 1994. Defendant's mother testified that Marco's head was shaved in December 1994, as depicted in the same photograph.**14**

## II. PENALTY PHASE EVIDENCE

### A. Prosecution Case

#### 1. *Victim Impact Evidence*

Hassan's widow, Alya Saed Hassan, testified (through an interpreter) about her husband's character and the effect of his death on loved ones. The couple had been married for 30 years and had three children, the youngest of whom was 10 years old at the time of trial. Alya described her husband as irreplaceable — the love of her life. He was exceptionally hardworking. For 16 years, he labored on farms, and the couple saved money, in order to buy the Casa Blanca Market. During the eight-year period in which they owned the store, Hassan worked on the premises 15 hours a day. The family lived next door in a trailer. Alya regretted

---

**13** The prosecution's rebuttal case also touched on the capital crime itself. Detective Hilger testified that defense witness Byron Northcutt stated before trial that each perpetrator may have had a gun when exiting the store. This evidence (1) supported the two-gun scenario described by Lupe and Vallejo in the prosecution's case-in-chief, and (2) undermined Northcutt's testimony for the defense that he could not tell if there was more than one rifle.

**14** Arcadia, Marco's mother, was called as the last defense witness at the guilt phase. Contrary to defense counsel's apparent expectation, Arcadia testified that defendant did *not* take Marco from her custody in December 1994. As noted, Arcadia's sister Elisabeth gave a similar account in the prosecution's rebuttal case.

having to start using welfare benefits after Hassan's death. The family could not afford mental health counseling to handle the loss.

### 2. *Unadjudicated Assault with a Firearm*

The prosecution presented evidence that, on August 29, 1994, four months before the capital crime, defendant shot at a car, knowing that his own son, Marco, was one of several people inside. The incident began when Arcadia came home from work and discovered that defendant had picked up Marco while he was being watched by Arcadia's sisters, Elisabeth and Maria Torres (Maria). Six people drove in a Thunderbird to retrieve Marco from defendant's mother's home, where defendant lived. They were Arcadia, Elisabeth, Maria, Maria's husband Ramon, Ramon's brother Angel, and Maria and Ramon's infant son.

According to all three witnesses who described the incident at trial — Maria, Elisabeth, and Ramon — Arcadia went to defendant's door, and the two began arguing. The couple then sat down on a bench. Meanwhile, Maria and Elisabeth exited the car, took Marco from the house, and got into the car with him. Maria testified that defendant may have momentarily retrieved Marco during this process, but Elisabeth had no such recollection. At some point, defendant asked Ramon to identify the driver, Angel. Arcadia reentered the car last. It then contained the six original occupants plus Marco.

All three witnesses gave similar, though not identical, accounts of what happened next. Maria heard multiple shots, and turned to see defendant holding a gun and "pointing to the car" at a downward angle. For reasons she did not explain, Maria believed defendant may have shot up into the air first before firing at the car. Elisabeth, in turn, saw defendant pull an object out of his pants, and heard several gunshots. Though Elisabeth did not see a gun or the direction in which it was aimed, she knew defendant was the shooter because no one else was

13

nearby. Ramon looked back out of the car window, and saw defendant get up from the bench and approach the car from behind. Defendant then took out a handgun and "pointed at the car." Standing seven or eight feet away, defendant fired three or four shots. Arcadia screamed, and the Thunderbird sped away.[15]

Angel, the driver, headed directly to a store, where the police were called. Officer James Rapozo of the Visalia Police Department arrived at the scene of the shooting around 10:00 p.m., soon after the shooting occurred. The victims described a custody dispute in which the child was retrieved from the father. The officer testified that he found two expended shells from a .380-caliber handgun in the road. He also saw two bullet holes in a wall nearby. One of them was two feet from the ground. In the dark, neither Officer Rapozo nor anyone in the Thunderbird saw damage to the car. The next day, however, Maria and Ramon saw a bullet hole in the rear spoiler.

## B. Defense Case

Defendant's older sister, Angelica Torres, provided a substantial amount of background information, as follows: Defendant's parents and all 10 of their children, including defendant (the third youngest child), were natives of Mexico. When they wed, defendant's father was 18 years old and his mother was 13 years old. They remained married at the time of trial.

Angelica recalled that, in Mexico, the family lived a "normal" life in a small town. They were neither rich nor poor. Both parents were hardworking. Defendant's father was the main provider, but he could not support the family alone. Defendant's mother was a seamstress. She cared for the children at home.

---

[15] Maria was not asked to describe the weapon defendant used. In passing, however, she called it a "shotgun." Elisabeth could not see what kind of gun it was. Ramon saw a handgun, not a long gun.

14

According to Angelica, she and defendant had a close emotional bond. She was 10 years older, and helped care for him as a child. When defendant was four years old and Angelica was 14 years old, she moved from Mexico to Los Angeles. Angelica stayed in touch with defendant and the rest of the family, visiting them often.

Angelica continued: When defendant was six or seven, the family moved to Visalia, where they bought their own home and have lived ever since. Both parents continued to support the family. Angelica, who moved back and forth between Los Angeles and Visalia, remained close to defendant. She eventually bought a home next door to her parents. At one point, Angelica, her mother, and other female relatives worked in the same factory. The extended family was both large and close.

At trial, Angelica acknowledged that her parents' marriage was not strife free. A few days before defendant was born in 1974, defendant's father beat his mother — a fact that upset defendant when he learned about it several years later. Angelica insisted defendant was a normal, healthy, and playful child. She described her mother as affectionate and gentle, and her father as emotionally distant from all of his children. The parents argued over little things. Angelica learned from her siblings that, once or twice, while she was not present or living at home, her father hit her mother.

Angelica testified that the family shared a strong belief that defendant did not commit the capital crime. Defendant's mother and other relatives helped care for his two children after his arrest. Their mother, Arcadia, was young and

reportedly distracted from her parental duties. According to Angelica, defendant was a proud and devoted father.[16]

Defendant's wife Claudia testified that she had known defendant since the eighth grade. She would love, support, and communicate with him even if he spent his entire life in prison. She planned to maintain a relationship with defendant's children and to help them stay close to their father. When asked how she would feel if defendant were sentenced to death, Claudia replied that "they could put me to death, too."

The defense also called Bill Wittman, who was elected Sheriff of Tulare County 18 months before he appeared at trial. Wittman testified that he had known defendant for at least 10 years ending in 1993, before the capital crime. Defendant was a "good kid" who participated in recreational sports at a community center that Wittman helped build and run. Wittman occasionally visited defendant's family in their home near the center. Except for defendant's older brother, Fernando, who was a bully with an arrest record, other family members seemed warm and hospitable. Once, defendant refused payment for work he and other children had performed on Wittman's ranch.

Louisa Duarte had lived next door to defendant's family since they moved from Mexico to Visalia. She testified that defendant and his siblings were well-

---

[16] On cross-examination, Angelica acknowledged that all of her siblings, including defendant, had volatile temperaments. For the most part, however, they were a productive and law-abiding group. At the time of trial, Angelica was a college student who worked for the Federal Aviation Administration. One sister, Gloria, had held the same job since she came to the United States, and another sister, Erma, was a housewife and former factory worker. Two other sisters, Maria Alejandra and Monica, were medical assistants studying nursing in college. Their brother, Pablo, was married and employed in the construction industry.

behaved and respectful. Defendant practiced speaking English, his second language, with Duarte. He always had a "special smile."

## C. Prosecution Rebuttal

Arcadia, the mother of defendant's children, testified that defendant had seen his daughter, Jasmine, only twice since her birth. He provided no financial support for either Jasmine or her brother, Marco.

Jerry Speck supervised defendant when he was on juvenile probation for possessing a pellet gun at school. Speck testified that in October 1991, defendant declined Speck's request to perform court-ordered community service. Defendant became loud and defiant and refused to calm down. Speck arrested him and took him to juvenile hall. On cross-examination, Speck disclosed that defendant was pleasant when he was not angry, and that he had trouble appreciating the consequences of his actions.

## D. Defense Surrebuttal

Victor De Vaca was a teacher who met defendant when he attended middle school. De Vaca testified that he once drove defendant to a special event where defendant received an award that the teachers gave to certain students. Defendant was a typical student — "all boy" — in De Vaca's view. On cross-examination, De Vaca noted that defendant had participated in a few fights at school, and that De Vaca had driven him home afterwards.

## III. JURY SELECTION ISSUES

Defendant maintains that, for various reasons, the trial court failed to explain to the prospective jurors certain general legal principles applicable in all criminal trials. He contends the omission violated his federal and state constitutional rights to due process, an impartial jury, equal protection, effective representation, and a reliable capital determination. (U.S. Const., 5th, 6th, 8th &

17

14 Amends.; Cal. Const., art. I, §§ 16, 17.) A related statutory claim is also made. (Code Civ. Proc., § 223.) No error occurred.[17]

## A. Background

The jury selection process took place over a three-week period in August and September 1996. The trial court first read the information to all prospective jurors, and emphasized that it involved "mere allegation."

The court then explained the bifurcated nature of the trial, to wit, that jurors would decide guilt of the charged crimes in the first phase, and that only in the event of a first degree murder conviction and a special circumstance finding would a penalty phase occur. The court identified the death penalty as one possible sentencing choice. As a time estimate, the court predicted (accurately) that, at most, the guilt trial would last one to two weeks, and that the pretrial jury selection process could take "a little bit longer."

Prospective jurors were divided into two panels. In the presence of both counsel, the court questioned and excused numerous candidates on hardship

---

**17** As to this and virtually all other appellate claims, defendant contends that an issue raised and decided in the trial court resulted in constitutional violations, but he did not present those constitutional theories below. In such instances, it appears that (1) the appellate claim is the kind that required no trial court action to preserve it, or (2) the new arguments do not invoke facts or legal standards different from those the trial court was asked to apply, but merely assert that the trial court's act or omission, in addition to being wrong for reasons actually presented to that court, had the legal consequence of violating the Constitution. To that extent, defendant's new constitutional arguments are not forfeited on appeal. (*People v. Boyer* (2006) 38 Cal.4th 412, 441, fn. 17 (*Boyer*), applying *People v. Partida* (2005) 37 Cal.4th 428, 433-439.) In the latter case, no separate constitutional discussion is required or provided where rejection of a claim that the trial court erred on the issue presented to that court necessarily leads to rejection of any constitutional theory or "gloss" raised for the first time here.

18

grounds. Counsel jointly stipulated to many of these excusals. The court estimated that as many as 137 people "passed hardship."

Next, the trial court described the jury selection process to each panel of prospective jurors. First, the court discussed the need for written questionnaires on a broad range of topics. The court also announced its plan to examine each person on an individual basis, outside the presence of other prospective jurors. In doing so, the court sought to promote candor and save time.

Second, the trial court told all prospective jurors that the death penalty would be explored during each personal sequestered voir dire. The court further stated that, during these sessions, *both* the court *and* counsel (i.e., "myself and the attorneys") would inquire about "*additional areas* concerning [jurors'] ability to be fair and impartial." Counsel would receive copies of the completed questionnaires before voir dire in order to study them and prepare questions.

Third, the trial court advised both groups of prospective jurors about the standard of proof at the guilt phase. The court said, "If the jury is convinced beyond a reasonable doubt the defendant is guilty of murder in the first degree, and that the special circumstance of murder in the commission of a robbery is true, then the trial will go into a second phase." Each panel was also told that both parties were entitled to a fair and impartial jury, and that jurors must "abide by the law" set forth in the instructions.

Following these advisements, the trial court asked prospective jurors to complete a lengthy questionnaire, and to sign it under penalty of perjury. The written questions concerned such topics as personal background, views on capital punishment, attitudes toward the criminal justice system, and opinions about defendant and the charged crimes.

On the latter topic, question No. 64(a) asked whether, for any reason, the prospective juror had "formed or expressed any opinion as to the guilt or

19

innocence" of defendant, and to explain any "yes" answer. Question No. 76 (echoed in question No. 85) addressed the related issue whether the person harbored any "bias" or "prejudice" toward defendant that would affect the ability to render a decision "under the law." Question No. 79 alluded, in turn, to certain controlling legal principles — the defendant's privilege not to testify, the presumption of innocence, and the People's burden of proof. Thus, prospective jurors were asked to explain whether they "disagree[d] with the law" or could not "follow the law" allowing the defendant to remain silent at trial. A similar explanation was sought as to any belief that a criminal defendant "should have to prove he or she is not guilty," as opposed to the People having to prove guilt.

Guided by the handwritten answers to such questions, the trial court and counsel jointly conducted individual sequestered examinations of all prospective jurors. Each interview had a similar format, as follows:

First, the trial court almost always began by repeating its advisement about application of the reasonable doubt standard at the guilt phase, and/or by emphasizing that the People bore such burden of proof. Otherwise, except in a few cases not involving persons who later served as actual or alternate jurors, any deviation from this general pattern involved instances in which (1) defense counsel advised prospective jurors about the standard and burden of proof at the guilt phase, (2) the prospective juror volunteered his or her understanding of such principles, or (3) defense counsel summarily exercised or agreed to a challenge for cause based on some patently disqualifying factor (e.g., automatic preference as to penalty or inability to attend trial).

Second, during the interviews, the trial court inquired about the person's views on the death penalty and on life imprisonment without the possibility of parole. Both counsel routinely asked follow-up questions on sentencing.

20

Third, as previously authorized by the court, counsel on both sides inquired during individual sequestered voir dire, often vigorously, about *other* factors bearing on the prospective juror's ability and willingness to serve in a fair and impartial manner. Many exchanges concerned the meaning of a criminal defendant's right to a fair determination of guilt beyond a reasonable doubt, including any knowledge or experience gained during prior jury service in criminal trials. Other questions concerned whether the person harbored any bias against the defense, or could follow the law and instructions.

During this process, the trial court granted numerous challenges for cause by the parties. Apparently, 81 prospective jurors remained in the pool afterwards — almost 60 fewer persons than before the process began.

Defense counsel then asked whether the trial court intended to conduct "any so-called general type voir dire in the sense of jurors that have any problems with reasonable doubt or the burden of proof." Counsel suggested that prospective jurors be assembled "in the box" for this purpose. The court declined to do so, saying "[w]e did a voir dire. I don't know why I need to do any more." When the court sought to clarify the defense request in any event, counsel said, "We never had a question that really has to do with just jurors['] understanding and acceptance of the burden of proof, the presumption of innocence. Some of this general stuff that we always do."

In response, the court offered to read CALJIC No. 0.50, a standard pretrial instruction on the basic functions, duties, and conduct of jurors. Counsel agreed. He said, "[f]ine with me," "I don't have any problem with that," and "I don't want to tie up a lot of time." The court said it would "go ahead and do it," and would

21

ensure that no one had "any problem[ ]" with "following those laws." Counsel did not raise the issue again.[18]

One week later, at the next court session, the court assembled the prospective jurors to allow the parties to exercise peremptory challenges. Before this process began, the court instructed the jury with the legal principles to which defense counsel had referred. Specifically, prospective jurors were reminded of the nature of the charges, and were repeatedly told that the People bore the burden of proving guilt beyond a reasonable doubt. The court dismissed any suggestion that defendant "need[ed] to prove his innocence," and reaffirmed that defendant "ha[d] no burden to prove anything."

Ultimately, in selecting the actual jury, the prosecution exercised nine peremptory challenges and the defense exercised seven peremptory challenges. Each side exercised three peremptory challenges against potential alternate jurors.[19] After the actual and alternate jurors were sworn, and before opening statements began, the court read CALJIC No. 0.50, as it had promised to do.

### B. Analysis

Defendant's main claim is that the trial court essentially had a sua sponte duty to question every prospective juror either individually or collectively about

---

[18] The version of CALJIC No. 0.50 ultimately given at defendant's trial described the nature of the factfinding function, the duty to accept and follow the law and instructions whether or not the juror agrees with them, the need for a verdict free of bias and outside influence, the definition of evidence, the sanctity of the deliberative process, and the right of jurors to take written notes and request a read-back of testimony.

[19] Now, as at the time of defendant's trial, Code of Civil Procedure section 231, subdivision (a), states in pertinent part: "In criminal cases, if the offense charged is punishable with death, or with imprisonment in the state prison for life, the defendant is entitled to 20 and the people to 20 peremptory challenges."

22

general principles of law concerning both the standard and burden of proof, and the presumption of innocence. Having not done so, the court allegedly deprived defendant of the opportunity to identify and excuse persons who were biased against him or unable to follow such laws. We disagree.

There is no constitutional right to voir dire per se. Nor is there any constitutional right to conduct voir dire in a particular manner. (*People v. Robinson* (2005) 37 Cal.4th 592, 613.) Rather, the voir dire process serves as a means of implementing the defendant's Sixth Amendment right to an impartial jury. (*Ibid*.; accord, *People v. Fuiava* (2012) 53 Cal.4th 622, 654 (*Fuiava*).)

Consistent with applicable statutory law,[20] the trial court has wide latitude to decide the questions to be asked on voir dire (*People v. Rogers* (2009) 46 Cal.4th 1136, 1149), and to select the format in which such questioning occurs. (See *Stitely, supra*, 35 Cal.4th 514, 536-539.) The court likewise has broad discretion to contain voir dire within reasonable limits. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1120.) Unless the voir dire "is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the

---

[20]   At the time of trial, Code of Civil Procedure section 223 stated in pertinent part: "In a criminal case, the court shall conduct the examination of prospective jurors. However, the court may permit the parties, upon a showing of good cause, to supplement the examination by such further inquiry as it deems proper, or shall itself submit to the prospective jurors upon such a showing, such additional questions by the parties as it deems proper. Voir dire of any prospective jurors shall, where practicable, occur in the presence of the other jurors in all criminal cases, including death penalty cases." (Added by Prop. 115, as approved by voters, Primary Elec. (June 5, 1990).) Effective January 1, 2001, the statute was amended to give counsel for each party an expanded, though not unlimited, right to examine prospective jurors through direct oral questioning. However, the provision regarding group voir dire and the limitation thereon remained unchanged. (Code Civ. Proc., § 223, as amended by Stats. 2000, ch. 192, § 1, p. 2216; see *People v. Stitley* (2005) 35 Cal.4th 514, 536-537 & fn. 11 (*Stitley*).)

manner in which voir dire is conducted is not a basis for reversal." (*People v. Holt* (1997) 15 Cal.4th 619, 661 (*Holt*); accord, *Fuiava, supra*, 53 Cal.4th 622, 654; *People v. Bolden* (2002) 29 Cal.4th 515, 538 (*Bolden*).) We know of no authority, and defendant cites none, suggesting that group voir dire is *necessarily* required, or that the trial court must *always* question every prospective juror either alone, or as part of a group, about general legal principles, including those at issue here.

In applying the foregoing authorities, we note as a threshold matter that defendant has not properly preserved his challenge to the fairness and adequacy of voir dire on reasonable doubt and similar concerns. Trial counsel requested a group voir dire on such general law after individual sequestered examinations had occurred and challenges for cause had been exercised. The court made a preliminary ruling that the individualized voir dire it had already conducted was sufficient, and that a resumption of the process in any form was unnecessary and unduly time consuming. After briefly discussing the matter further, and in an apparent abundance of caution, the court decided to give further instruction on the matter. Counsel did not object to this ruling on any ground. Instead, he embraced the court's instructional approach and stopped pursuing additional voir dire.

Under these circumstances, defendant has forfeited his claim that the trial court's rejection of his request for additional voir dire on certain issues, and its related decision to instruct jurors on their proper role at trial, was erroneous or incomplete. Regarding the alleged shortcoming in voir dire, defendant could not merely "suggest that particular questions be asked, and then silently stand by when the trial court suggests and subsequently takes a different course — a trial court reasonably could view such silence as constituting assent to the court's approach." (*Fuiava, supra*, 53 Cal.4th 622, 653 [defendant forfeited claim that trial court should have asked questions he had requested about self-defense in the context of

24

the particular case, where defendant did not object when the court instead asked prospective jurors about generally following the law on self-defense].)[21]

Defendant's substantive claim also fails on the merits. The trial court did not conduct voir dire alone, devoid of any meaningful participation by counsel. Rather, both parties had ample opportunity to probe for hidden bias and to explore any other factor bearing on juror impartiality. (See *Holt, supra*, 15 Cal.4th 619, 661.) Counsel took full advantage of the situation. Indeed, defendant admits in his opening brief on appeal that the court "did not restrict" counsel on voir dire. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 47.)

Moreover, viewed as a whole, the oral examination and the questionnaires on which it was based covered the general principles of law that defendant now claims were not adequately explored on voir dire. Before completing the questionnaires, all prospective jurors were told that the reasonable doubt standard applied to a determination of guilt of the charged crimes, and that they must follow the law as instructed by the court. Against this backdrop, the questionnaire asked — albeit, in lay terms — about the presumption of innocence (i.e., whether

---

[21]     The Attorney General argues in passing that defendant's claim of inadequate voir dire was forfeited primarily because he failed to challenge biased jurors for cause or to exhaust his peremptory challenges. (Compare *People v. Hart* (1999) 20 Cal.4th 546, 589 [holding defendant cannot complain on appeal that the jury included specific unacceptable persons where he failed to challenge them for cause, failed to exhaust his peremptory challenges, and expressed satisfaction with the jury as impaneled] with *Bolden, supra*, 29 Cal.4th 515, 537-538 [holding failure to exhaust peremptory challenges does not forfeit complaint about the adequacy of general group voir dire because defendant may have been denied information needed to intelligently exercise such challenges].) In light of the alternative analysis set forth above, we need not, and do not, address the Attorney General's particular theory of forfeiture here.

the prospective juror had formed any bias or prejudged guilt) and about the People's burden of proof (i.e., whether defendant must prove his own innocence).

Armed with the questionnaires, and guided by relevant written answers, both the court and counsel questioned prospective jurors about their views on the reasonable doubt standard, the burden of proof, and the presumption of innocence. The court began most exchanges by repeating its advisement on reasonable doubt. Where necessary or advisable, the court and counsel also explored whether prospective jurors could give defendant the benefit of these principles, or whether some bias or other factor would prevent them from following the law and instructions in this regard. In short, nothing prevented defendant from identifying and removing prospective jurors who did not understand or accept the general principles of law involved here.

Taking a different tack, defendant next contends that voir dire was prejudicially incomplete insofar as the trial court did not ask certain questions in the exact form recommended by the Judicial Council in the California Standards of Judicial Administration (Standards). (See, e.g., stds. 4.30(b)(13) [whether prospective juror can ignore everything heard as a juror in a prior criminal case and decide the present case based solely on the evidence and applicable law], 4.30(b)(14) [whether prospective juror can ignore instructions received as a juror in a prior civil case, and apply the different rules which govern the trial of criminal cases, including the People's burden to prove guilt beyond a reasonable doubt], as renumbered and amended eff. Jan. 1, 2007.)

Contrary to what defendant implies, any trial court decision declining to use the Standards verbatim does not necessarily mean that voir dire failed to expose prospective jurors who were biased or unable to follow the law. (See, e.g., *People v. Lopez* (2013) 56 Cal.4th 1028, 1046; *Bolden, supra*, 29 Cal.4th 515, 538.) Nor does any technical deviation from the Standards excuse a reviewing court from

26

examining " 'the entire voir dire' " to determine whether it was sufficient to secure an impartial jury. (*Lopez, supra*, 56 Cal.4th at p. 1046, quoting *Holt, supra*, 15 Cal.4th 619, 661.)

As we have explained, our review shows that prospective jurors were informed before the exercise of challenges for cause about the need to apply the reasonable doubt standard and to follow the law and instructions. Later, at the start of the peremptory challenge phase, the court gave another reasonable doubt instruction that included additional principles about the People's burden of proof and the presumption of innocence. In the interval between these two events, the trial court instructed and questioned specific jurors on all of these principles of law. Counsel on both sides freely asked their own informed questions on the topic. Thus, regarding the Standards, "all appropriate areas of inquiry [were] covered in an appropriate manner." (*Holt, supra*, 15 Cal.4th 619, 661.)

Finally, defendant argues that voir dire concerning reasonable doubt and related principles was constitutionally deficient because defense counsel did not know until *after* all prospective jurors had been examined alone that no general group voir dire was planned. Citing no authority, defendant insists the trial court was required to specifically advise counsel of this procedure before jury selection began to ensure counsel examined each prospective juror about any biases he or she might harbor toward "specific legal doctrines." No error occurred.

Contrary to what defendant suggests, defense counsel could not reasonably assume that group voir dire would inevitably occur or that it was necessary in light of jury selection procedures otherwise in place. Counsel presumably was competent and aware of the trial court's authority to decide the manner in which questioning would occur, including the option to forgo general voir dire in open court. (See *Holt, supra*, 15 Cal.4th 619, 704 [assuming trial counsel had sound basis on which to conduct voir dire and ensure bias-free jury absent contrary

evidence in record].) To this end, the trial court announced twice, before conducting any individual sequestered voir dire, that the private interviews would include, but would not be limited to, the death penalty. In fact, the court made clear that "additional areas" of potential bias would be explored, and that both the court and counsel would perform that task.

It follows that defense counsel was responsible during each individual sequestered session for being informed about any critical topic overlooked by the trial court, and for making tactical decisions on how best to respond. Counsel was on notice that he could examine prospective jurors one-on-one about their willingness and ability to apply reasonable doubt and related principles in determining guilt. As noted above, we presume counsel was competent to perform this task. Accordingly, the trial court had no constitutional or other duty to advise counsel about when or how to ask questions on certain general legal principles, or about individual sequestered voir dire constituting his sole opportunity to do so.

For all the foregoing reasons, we reject defendant's claim that the trial court conducted an inadequate voir dire, or that reversible error otherwise occurred.

## IV. GUILT AND SPECIAL CIRCUMSTANCE ISSUES

### A. Relationship between Charge and Conviction of Murder

Defendant observes that the information charged him with "MURDER, in violation of PENAL CODE SECTION 187(a)," and alleged that he acted "willfully, unlawfully, and with malice aforethought." According to defendant, he stood accused only of "second degree malice murder," and could not be convicted of first degree felony murder, as set forth in the instructions and verdict. Insisting he was never properly charged with the latter crime under section 189, defendant asks us to conclude that the trial court exceeded its jurisdiction and violated his federal and state constitutional rights to due process and a fair trial, trial by jury,

and a reliable guilt determination.  (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15-17.)[22]

Similar claims — whether framed in terms of a lack of jurisdiction, inadequate notice, erroneous instruction, insufficient proof, or the absence of jury unanimity — have been rejected before.  As defendant recognizes, our cases have long made clear that an accusatory pleading charging malice murder supports conviction of first degree murder on a felony-murder theory.  Malice murder and felony murder are two forms of the single statutory offense of murder.  Thus, a charge of murder not specifying the degree is sufficient to charge murder in any degree.  The information also need not specify the theory of murder on which the prosecution relies at trial.  (See *People v. Jones* (2013) 57 Cal.4th 899, 968-969); *People v. Abel* (2012) 53 Cal.4th 891, 937 (*Abel*); *People v. Moore* (2011) 51 Cal.4th 386, 412-413 (*Moore*); *People v. Geier* (2007) 41 Cal.4th 555, 591; *People v. Hughes* (2002) 27 Cal.4th 287, 368-369; *People v. Gallego* (1990) 52 Cal.3d 115, 188-189; *People v. Murtishaw* (1981) 29 Cal.3d 733, 750-751 & fn. 11; *In re Walker* (1974) 10 Cal.3d 764, 781; *People v. Golston* (1962) 58 Cal.2d 535, 539; *People v. Witt* (1915) 170 Cal. 104, 107-108.)

Defendant counters that insofar as we have recognized a single statutory offense of first degree murder, the only charging statute applicable here was section 189.  This assertion stems solely from *People v. Dillon* (1983) 34 Cal.3d 441.  In pertinent part, *Dillon* described section 189 "as a statutory enactment of the first degree felony-murder rule in California."  (*Dillon* at p. 472.)

---

[22]    As pertinent here, section 187, subdivision (a), defines murder as "the unlawful killing of a human being . . . with malice aforethought."  Section 189 defines first degree murder to include, among other things, murder "which is committed in the perpetration of, or attempt to perpetrate, . . . robbery."

29

However, in *People v. Harris* (2008) 43 Cal.4th 1269 (*Harris*), we rejected a similar argument, as follows: "*Dillon* made it clear that section 189 serves *both* a degree fixing function and the function of establishing the offense of first degree felony murder. [Citation.] It defines second degree murder as well as first degree murder. Section 187 also includes both degrees of murder in a more general formulation." (*Id*. at p. 1295.) As in *Harris*, the section 187 charge brought here supported a murder conviction in any degree, including first degree felony murder. Nothing in *Dillon* compels a different result. We decline to reconsider this view.

In his final challenge to the murder charge, defendant argues that the foregoing principles and authorities have been abrogated by *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*). The sole support for this claim is a statement in *Apprendi* that " 'any fact (other than prior conviction) that increases the maximum penalty for a crime must be *charged in an indictment*, submitted to a jury, and proven beyond a reasonable doubt.' " (*Id*. at p. 476, italics added.) The "fact" defendant claims was fatally omitted from murder as charged in the information here was his alleged commission of the serious felony (robbery) on which the first degree felony-murder verdict was ultimately based.

Contrary to what defendant implies, the *Apprendi* court expressly declined to address the constitutional implications, if any, of omitting sentencing factors from accusatory pleadings. (*Apprendi, supra*, 530 U.S. 466, 477, fn. 3 [noting that no "indictment question" was properly presented or actually addressed in the case].) Absent any authority compelling a different result, we conclude here, as in other cases, that defendant's reliance on *Apprendi* is misplaced. (See *Abel, supra*, 53 Cal.4th 891, 938; *People v. Famalaro* (2011) 52 Cal.4th 1, 37 (*Famalaro*); *Moore, supra*, 51 Cal.4th 386, 413; *Harris, supra*, 43 Cal.4th 1269, 1295.)

In particular, *Apprendi*'s core reasoning is that every factual finding (other than the fact of a prior conviction) required by law in order to increase the penalty

30

beyond the prescribed statutory maximum for the offense is the "functional equivalent" for constitutional purposes of an element of a greater offense. (*Apprendi, supra*, 530 U.S. at p. 494, fn. 19.)  Hence, consistent with due process and jury trial guarantees, sentencing factors having such an " 'elemental' nature" must be submitted to a jury and proved by the State beyond a reasonable doubt. (*Id*. at p. 494; see *People v. Anderson* (2009) 47 Cal.4th 92, 105-106, 116.)

In light of the high court's "narrow" holding (*Apprendi, supra*, 530 U.S. 466, 474), which focuses on facts that must be proved to, and found by, a jury, "[i]t is highly doubtful that *Apprendi* has any effect whatever on pleading requirements" (*Famalaro, supra*, 52 Cal.4th at p. 37).  In other words, *Apprendi*'s requirements for how element-like sentencing factors must be *proved* and *found* create no "new notice requirements for alternative *theories* of a substantive offense such as a theory of first degree murder." (*Abel, supra*, 53 Cal.4th at p. 938; accord, *Moore, supra*, 51 Cal.4th at p. 413.)

Thus, this court does not violate *Apprendi* by continuing to apply the traditional California rule that a murder charge under section 187 places the defense on notice of, and allows trial and conviction on, all degrees and theories of murder, including first degree felony murder under section 189.  Defendant's opposing view is unfounded.  We reject it here.

### B.  Cross-examination of Lupe

Defendant argues that, for several reasons, the trial court erred in preventing him from admitting Lupe's report cards to contradict testimony elicited on cross-examination about Lupe's performance in high school after the capital crime.  He alleges the court's ruling violated his federal constitutional rights to due process, to confrontation and compulsory process, and to a reliable capital determination.  (U.S. Const., 5th, 6th, 8th & 14th Amends.)

31

### 1. *Background*

As noted, Lupe testified on direct examination about defendant's statement promising to "get" anyone who spoke about the robbery murder. The implication, which redirect examination confirmed, was that Lupe felt personally threatened by defendant, and that he (Lupe) believed he would be harmed or killed if he made any incriminating statements. The prosecution elicited no other information about how the capital crime may have affected Lupe's daily life at any point after December 29, 1994, the day the crime occurred.

With no initial objection from the prosecutor, defense counsel raised the latter issue near the end of Lupe's cross-examination. Specifically, Lupe testified that he had read in the newspaper the day after the robbery murder that someone died in the store. Despite being scared and upset, Lupe did not report the incident to the police or to any other authority figure. Lupe testified, however, that once he was contacted by the police in August 1995, he had no difficulty cooperating with them and disclosing what he knew.

In the course of this exchange, defense counsel inquired about Lupe's performance in high school during the same time period. When asked whether he did "better or worse" in school after the capital crime, Lupe replied, "I don't know, a little worse." He testified that as time passed, he felt no increased pressure to report the capital crime. Indeed, Lupe found that he "could concentrate more" a couple of months after returning to school in January 1995. He explained that he did not forget about the crime, but that the negative feelings did not bother him as much. Lupe further testified on cross-examination that, after first speaking with the police in August 1995, he felt relieved and "could concentrate better."

At this point in the process, defense counsel asked whether Lupe had received any high school report cards, a question answered in the affirmative. The

prosecutor requested a sidebar conference, and objected on relevance grounds. Defense counsel explained that, contrary to what Lupe had testified, his grades "went up" when he returned to school in January 1995, such that his existing 1.0 grade point average rose somewhat to "all Cs and passing." Counsel contrasted this initial upward trend with Lupe's grades after he spoke to the police in August 1995. That semester, according to counsel, Lupe's grades did not improve as Lupe had implied they did. Rather, they "drop[ped] way down, worse than he had ever done  He had some D-minuses and Cs."

Consistent with the prosecutor's view, the trial court declined to allow Lupe to be cross-examined about his report cards. Lupe's grades had no logical bearing, the court said, on whether Lupe felt good or bad because of the capital crime. The court viewed any inferences raised in that regard as improper impeachment on a collateral matter, saying "[i]t is way, way out."

Cross-examination resumed.  Defense counsel raised the possibility that Lupe was not telling the truth regarding his feelings about the capital crime and cooperating with the police. First, Lupe was asked whether, between the time the capital crime occurred in December 1994, and the time Lupe spoke to the police in August 1995, he was *not* actually bothered or distressed because he was "not really at the little market the day that the incident happened." The answer was "[n]o." In a follow-up question, counsel asked whether, from the time Lupe spoke to the police about the capital crime through the next semester in school, he *was* actually bothered and distressed because he had "claimed to be involved in that incident when [he] really [wasn't]." Again, Lupe answered "[n]o." This line of inquiry ended when Lupe denied implicating defendant in the shooting in order to shift blame away from Jose, defendant's alleged accomplice and the boyfriend of Lupe's sister, Yesenia.

33

Following both redirect and recross examination, and outside the presence of the jury, defense counsel renewed his request to admit the report cards to impeach Lupe's testimony about his school performance and about his feelings regarding the capital crime. Counsel claimed it was "common knowledge that young people do have problems with school" and that poor grades show "when a problem's going on in their life." All counsel sought to do, he said, was to ask Lupe about the apparent discrepancy between his testimony concerning the effect of his feelings on his school performance on the one hand, and his grades as reflected in his report cards on the other hand. In the alternative, counsel was willing to offer only the report cards themselves into evidence.

The prosecutor again objected on relevance grounds. She argued that the defense had not shown that there was any link between Lupe's grades and the capital crime, or that other life problems had not affected his school performance.

Consistent with its prior ruling, the trial court declined to admit the grade reports in any form. The court reasoned that such evidence had "no relevance to anything." In other words, to the extent Lupe's actual grades contradicted his testimony about his school performance, such impeachment would involve an irrelevant, collateral matter. Hence, the court saw no reason to discuss whether the probative value was substantially outweighed by the risk of unfair prejudice, jury confusion, or the undue consumption of time under Evidence Code section 352. On this score, the court said, "I don't think I even have to bring in [section] 352 because [the proffered impeachment evidence] is simply not relevant."

### 2. *Manner in which trial court exercised its discretion*

Defendant first argues that the report cards contradicted Lupe's testimony about whether the capital crime upset him and affected his school performance. This information, which was elicited on cross-examination, was assertedly

34

material because it bore on the larger question whether Lupe was credible insofar as he implicated defendant in the capital crime. On this basis, defendant claims the trial court abused its discretion in preventing him from asking Lupe about his report cards and in excluding them at trial. We disagree.

To be relevant, evidence must have some "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) This definition includes evidence "relevant to the credibility of a witness." (*Ibid*.; see Evid. Code, § 780 [the fact finder may consider matters relevant to the truthfulness of the witness's testimony].)

Conversely, a matter is "collateral" if it has no logical bearing on any material, disputed issue. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9 (*Rodriguez*).) A fact may bear on the credibility of a witness and still be collateral to the case. (*Ibid*. [preventing prosecution witness who saw the murder from the roof of his apartment building from being impeached with evidence disputing his claim that he had management's permission to be there]; see *People v. Dement* (2011) 53 Cal.4th 1, 50-52 (*Dement*) [holding that an inmate who testified for the prosecution about seeing a prison murder could not be impeached with evidence that he had lied in court about a murder he was convicted of many years before]; *Harris, supra*, 43 Cal.4th 1269, 1291-1292 [not allowing prosecution witness who described alleged murderer's incriminating statements to be impeached with his poor performance on juvenile probation even though it showed lax character].)

Of course, the trial court has wide latitude under state law to exclude evidence offered for impeachment that is collateral and has no relevance to the action. (*People v. Homick* (2012) 55 Cal.4th 816, 865; *Harris, supra*, 43 Cal.4th 1269, 1291; *Rodriguez, supra*, 20 Cal.4th 1, 9-10.) This exercise of discretion necessarily encompasses a determination that the probative value of such evidence is "substantially outweighed" by its prejudicial, "confusing," or time-consuming

nature. (Evid. Code, § 352; see *People v. Lewis* (2001) 26 Cal.4th 331, 374-375 [noting that Evid. Code, § 352 gives trial court broad power to prevent " ' "nitpicking" ' " over " ' "collateral credibility issues" ' "].)

Also, as long as the excluded evidence would not have produced a " ' "significantly different impression" ' " of the witness's credibility, the confrontation clause and related constitutional guarantees do not limit the trial court's discretion in this regard. (*Dement, supra*, 53 Cal.4th 1, 52 [The " 'ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense' "]; see *Harris, supra*, 43 Cal.4th 1269, 1292 [" 'Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.' "]; accord, *People v. Mendoza* (2011) 52 Cal.4th 1056, 1090.)

Here, the trial court did not abuse its discretion in excluding the report cards as virtually irrelevant and wholly collateral to the case. The report cards showed nothing more than that Lupe's grade pattern differed from his testimony about his school performance (i.e., whether his performance or concentration was "worse" or "better") in the months after the capital crime. At most, the report cards suggested he was lying or mistaken about the pattern of his grades during that time. Any discrepancy between Lupe's grade pattern and his related testimony does not show (1) why he performed in school in a particular manner and earned certain grades, (2) whether he saw events at the crime scene or heard the perpetrators' admissions afterwards, or (3) whether he had any reason to falsely implicate defendant in the latter events. In other words, no substantive inference could be drawn from the report cards, or from any testimony proffered thereon, about defendant's guilt of the capital crime. Hence, the report cards merely constituted an attempt to collaterally impeach Lupe on an irrelevant matter.

It bears emphasis that the defense otherwise had "ample opportunity" to impeach Lupe.  (*Harris, supra*, 43 Cal.4th 1269, 1292.)  Cross-examination revealed certain discrepancies between Lupe's trial testimony on the one hand, and both his testimony at the preliminary hearing and his statements to police on the other hand.  Examples included whether defendant or Jose ever told Lupe what happened inside the Casa Blanca Market; whether defendant, Jose and Santos used masks when committing the capital crime; and whether Louis made a U-turn to pick up defendant and Jose before fleeing the crime scene.  Lupe testified that he either could not remember, or did not know, why his various accounts may have differed in these respects.

In addition, defense counsel tested Lupe's memory of certain details he gave on direct examination.  This process covered key issues, such as the circumstances under which the guns were placed in Louis's car before the capital crime.  Lupe was also asked whether he was generally guessing or lying at trial — accusations he denied.

For all these reasons, no abuse of discretion in excluding testimony and documentary proof about Lupe's high school grades occurred.

### 3. *Trial court's alleged failure to exercise discretion*

Defendant next contends that the trial court behaved in an erroneous and arbitrary manner because it "failed to perform *any* balancing functions" in excluding Lupe's report cards and preventing cross-examination about them.  This claim focuses on the court's statement about not "bring[ing] in" Evidence Code section 352.  Defendant insists the court simply refused to decide whether the evidence offered to impeach Lupe was substantially more prejudicial than probative or otherwise implicated Evidence Code section 352.

37

Defendant mischaracterizes the trial court's ruling. As noted above, a determination that impeachment or other evidence should be excluded as "collateral" inherently involves the balancing contemplated by Evidence Code section 352. In such cases, the risk of causing the adverse effects that the court is statutorily authorized to prevent is necessarily high where the probative value of the evidence is low. Notwithstanding any inartful language used to describe its ruling, the court properly exercised such discretion here. For reasons we have explained, the proffered impeachment of Lupe about his school performance and related emotional state threatened to distract the jury's attention from critical concerns about the truth and accuracy of his testimony implicating defendant in the capital crime. No refusal to exercise discretion occurred.

#### 4. *Trial court's alleged lack of discretion*

In an apparent departure from his other two claims about Lupe's report cards, defendant insists the trial court had *no* discretion to exclude such evidence. He reasons as follows: The prosecutor did not object when defense counsel began questioning Lupe about his school performance and related emotional state — testimony defendant concedes could properly have been excluded as irrelevant if such a request had been made. Only after Lupe testified in a manner marginally favorable to the prosecution (e.g., that he felt relieved and more focused after speaking to the police) was a prosecutorial objection made and sustained by the court. This ruling was belated, erroneous, and unfair in defendant's view because, once the prosecution allowed Lupe to testify in a manner that could be proven false, the trial court was required to allow impeachment even if the line of inquiry was otherwise tangential to the case.

Defendant cites no authority, and we are aware of none, supporting his suggestion that both the prosecutor and the trial court breached some duty they

38

were obligated to perform concerning cross-examination about Lupe's school performance and grade reports after the capital crime. Rather, as noted above, the defense had no right to impeach Lupe on this collateral matter. (See *People v. Mayfield* (1997) 14 Cal.4th 668, 748, citing *People v. Lavergne* (1971) 4 Cal.3d 735, 744 [a party cannot "cross-examine a witness upon collateral matters for the purpose of eliciting something to be contradicted"].) Thus, even though Lupe was allowed to suggest that his grades went up or down for one reason or another, the trial court could properly sustain the prosecution's objection that further testimony along such lines lacked probative value and threatened to sidetrack the case. We reject defendant's contrary claim.

## C. Instruction on Past Misdemeanor Conduct

Defendant contends the trial court erred by failing to instruct sua sponte that the jury could consider past misdemeanor conduct in assessing the credibility of witnesses, namely, Vallejo. Defendant notes that the trial court gave CALJIC No. 2.20, which lists various factors that potentially affect such determinations. He complains, however, that the version given at his trial did not include standard language, which the court had the option of giving at the time, concerning "[p]ast criminal conduct of a witness amounting to a misdemeanor." (CALJIC No. 2.20 (6th ed. 1996).)[23] Such omission allegedly violated defendant's federal

---

**23**    CALJIC No. 2.20, as given at trial, stated: "Every person who testifies under oath is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness. [¶] In determining the believability of a witness you may consider anything that has a tendency in reason to prove or disprove the truthfulness of the testimony of a witness, including but not limited to any of the following: [¶] The extent of the opportunity or the ability of the witness to see or hear or otherwise become aware of any matter about which the witness has testified; [¶] The ability of the witness to remember or to communicate any matter about which the witness has testified; [¶] The character

*(footnote continued on next page)*

constitutional rights to due process, a fair jury trial, and a reliable capital determination. (U.S. Const., 6th, 8th & 14th Amends.) We reject the claim.

### 1. *Background*

On both direct and cross-examination, Vallejo explained that in August 1995, he had personal problems, was abusing drugs and alcohol, and was facing arrest on certain warrants. While intoxicated and determined to change his life, he called law enforcement officials. He was arrested that night and taken into custody. Vallejo told one or more officers, including Detective Hilger, that he had information about the capital crime. In doing so, Vallejo hoped to "take care" of his warrants.

Vallejo was cross-examined about his prior contact with the criminal justice system. Counsel began by asking whether Vallejo was "arrested" in the possession of certain "burglar tools" in April 1994. Vallejo said, "Yes, I got arrested with them." Counsel attempted to mark a police booking sheet related to that arrest as a defense exhibit. The trial court sustained the prosecutor's objection to the document, saying "booking is irrelevant."

Counsel then asked whether Vallejo had been arrested in another incident two months earlier, in February 1994. Before Vallejo answered, the prosecutor objected to the evidence as irrelevant, collateral, and unduly time-consuming. Defense counsel explained that the February 1994 arrest involved facts — e.g.,

---

*(footnote continued from previous page)*

and quality of that testimony; [¶] The demeanor and manner of the witness while testifying; [¶] The existence or nonexistence of a bias, interest, or other motive; [¶] Evidence of the existence or nonexistence of any fact testified to by the witness; [¶] The attitude of the witness toward this action or toward the giving of testimony; [¶] A statement previously made by the witness that is consistent or inconsistent with the testimony of the witness."

possession of a shotgun — that tended to link Vallejo to the capital crime, which occurred 10 months later, in December 1994. Counsel theorized that when Vallejo told the police about the capital crime in August 1995, he lied about defendant's guilt in order to "throw suspicion off himself" as the person who killed Hassan with a shotgun. Counsel otherwise denied trying to "impeach [Vallejo] because he's done bad things." After further discussion with counsel, the court decided to allow the questioning of Vallejo about the February and April 1994 arrests.

When cross-examination resumed, Vallejo answered "yes" when asked whether he was "arrested" for having "a couple of 12-gauge shotgun shells in [his] jacket pocket." Vallejo also noted that a shotgun was found nearby, but denied that it was in his possession. Defense counsel assumed in subsequent questioning that the same incident involved a "billy club" — an assumption Vallejo did not confirm or refute.

Vallejo was then cross-examined about what counsel referred to as a "misdemeanor" proceeding arising from the February 1994 arrest. Though he did not identify the underlying criminal charge at trial, Vallejo admitted that a warrant had issued for his "failure to appear," and that he had been jailed on December 31, 1995, as a result. Vallejo also answered "yes" when asked whether other warrants had issued in the misdemeanor case for failing to pay restitution and to serve 20 days in custody.

Next, defense counsel pressed Vallejo about his reasons for acting as an informant and witness against defendant. Vallejo answered "yes" when asked if he had been "supplying and selling drugs" to defendant and the other three men, and whether they owed him money as a result. However, Vallejo denied participating in the present case because of anger over an unpaid debt. In a related vein, Vallejo gave a "yes" answer when asked whether he had ever "use[d] methamphetamine during work hours."

Finally, both parties asked Vallejo and Detective Hilger to describe events after Vallejo gave his taped statement about the capital crime. Vallejo testified that he was promptly released from custody — a procedure that Hilger characterized as normal in misdemeanor warrant cases like Vallejo's. According to Vallejo, he signed no agreement with any agency concerning his testimony herein. Hilger gave a similar account. Hilger made no arrangement with the district attorney's office on Vallejo's behalf. Nor, to Hilger's knowledge, did Vallejo's cooperation in the present case affect any court matter in which he was otherwise involved.

### 2. *Analysis*

Defendant argues for the first time on appeal that the trial court should have instructed on "[p]ast criminal conduct of a witness amounting to a misdemeanor." (CALJIC No. 2.20 (6th ed. 1996); see CALCRIM No. 105.) He insists that, absent such an instruction, the jury would not have known it could consider such evidence in evaluating Vallejo's credibility insofar as he implicated defendant in the capital crime.

As a threshold matter, we assume solely for the sake of argument that the following circumstances are true, all of which favor defendant: (1) his complaint about the omitted instruction was not forfeited by failing to raise it at trial (see § 1259 [instructional claims affecting substantial rights are reviewable on appeal absent objection in trial court]), (2) evidence elicited on cross-examination about Vallejo's prior arrests and misconduct involved "moral turpitude" and therefore bore on his credibility as a prosecution witness, (3) the jury would not have known to consider Vallejo's past misconduct as a factor bearing on his credibility absent

42

the instructional language at issue here, and (4) the trial court had a sua sponte duty to give such an instruction.**24**

Nevertheless, any error was harmless. We are persuaded that an instruction highlighting Vallejo's past conduct would not have induced the jury to disbelieve his testimony that defendant shot and killed Hassan while robbing the Casa Blanca Market. (See, e.g., *People v. Farley* (2009) 46 Cal.4th 1053, 1105; *People v. Whisenhunt* (2008) 44 Cal.4th 174, 208.)

Though the defense showed that Vallejo had several brushes with the law, they were not highly persuasive on the issue of his character for honesty. Vallejo

---

**24** Though not mentioned by the parties on appeal, the law provides that any criminal act or other misconduct involving moral turpitude suggests a willingness to lie and is not necessarily irrelevant or inadmissible for impeachment purposes. (*People v. Wheeler* (1992) 4 Cal.4th 284, 295-296 (*Wheeler*); see *id*. at pp. 297-299 [misdemeanor conviction itself is inadmissible over a hearsay objection to prove misconduct bearing on credibility]; see also Cal. Const., art. I, § 28, subd. (f)(2) (Truth-in-Evidence provision).) However, to the extent such misconduct amounts to a misdemeanor or is not criminal in nature, it carries less weight in proving lax moral character and dishonesty than does either an act or conviction involving a felony. (*Wheeler, supra*, 4 Cal.4th at p. 296; see Evid. Code, § 788 [authorizing prior felony convictions for impeachment].) Hence, trial courts have broad discretion to exclude impeachment evidence other than felony convictions where such evidence might involve undue time, confusion, or prejudice. (*Wheeler, supra*, 4 Cal.4th at pp. 296-297; accord, *People v. Lightsey* (2012) 54 Cal.4th 668, 714; *People v. Clark* (2011) 52 Cal.4th 856, 931-932.)

We further note that "moral turpitude" refers to a general " 'readiness to do evil' " even if dishonesty is not necessarily involved. (*People v. Castro* (1985) 38 Cal.3d 301, 315; see *Wheeler, supra*, 4 Cal.4th 284, 295.) Under *Castro, supra*, 38 Cal.3d at page 317, the crime of possessing heroin for sale involves moral turpitude because of the intent to corrupt others. (See *People v. Harris* (2005) 37 Cal.4th 310, 336-339 [trial court erred in barring impeachment of prosecution witness as a "drug dealer"].) As noted above, Vallejo admitted, among other things, that he sold drugs to defendant and others implicated in the capital crime.

admitted selling drugs to defendant and his alleged accomplices. Otherwise, the evidence did not make clear what crimes Vallejo committed or whether any of the conduct involved moral turpitude. He did not dispute being arrested for possessing weapons (e.g., a billy club) and other items (e.g., burglary tools) associated with criminal activity. One of these arrests also apparently led to a misdemeanor proceeding in which warrants were issued for failure to perform court-ordered conditions. Indeed, defense counsel conceded that at least some of Vallejo's past misconduct was not even offered as evidence of a general bad character bearing on veracity.

Balanced against this checkered history, the prosecution introduced extensive evidence corroborating Vallejo's testimony about the capital crime, and indicating that he was telling the truth. At trial, Vallejo — who received no benefit from his cooperation in the case — described being present when Santos, Jose, and defendant incriminated themselves in a robbery murder the night of the Casa Blanca crimes. Based on these statements, Vallejo testified that defendant shot Hassan twice with a shotgun after he failed to cooperate and hand over any cash. According to Vallejo, defendant displayed a handgun he admitted taking from Hassan during the crime. Vallejo also testified that either defendant or Santos said that they had borrowed two long guns from Shorty (a shotgun and rifle) the night before, and that the guns would be used to pull a robbery "job."

Lupe gave the most detailed testimony supporting the information Vallejo attributed to the perpetrators. Lupe testified that he was in the car when Louis drove defendant, Jose, and Santos to the Casa Blanca Market in order to commit a robbery. According to Lupe, defendant and Jose each entered the store wearing face masks and carrying weapons similar to the ones Vallejo had described. Consistent with Vallejo's account, Lupe further testified that both Jose and defendant described what happened in the store, as follows: defendant shot Hassan

44

after he took out a handgun; no cash was offered or found; and property belonging to the victim was taken from the store. Like Vallejo, Lupe testified that defendant displayed a handgun while discussing his role as the actual killer.

Notably, other prosecution witnesses, some of whom did not know the perpetrators, confirmed *both* Vallejo's *and* Lupe's testimony in key respects. Like Lupe, an eyewitness, Amanda Garcia, saw three men at the crime scene wearing face masks. Two of the masked men ran out of the Casa Blanca Market (at least one of whom may have been armed), and a third man wore a similar disguise in the getaway car. Garcia identified Louis's car as the one the robbers used at the crime scene. In addition, defendant's friend Shorty and his wife, Mariela, corroborated Vallejo's testimony that defendant had access to the probable murder weapon, a shotgun. Defendant was also linked to Hassan's stolen handgun through Officer McIntosh, who obtained the weapon from defendant's brother, Fernando, shortly after the capital crime.

Thus, under any applicable standard, an instruction directing the jurors' attention to Vallejo's past misconduct would not have caused them to reject his testimony identifying defendant as the shooter in the capital crime. No prejudice occurred under the circumstances presented here.

### D. Single Witness Instruction

Defendant insists the trial court erred prejudicially in failing to instruct sua sponte with CALJIC No. 2.27, which concerns the circumstances under which the jury may rely on the uncorroborated testimony of a single witness. Defendant acknowledges that Lupe, Vallejo, and other prosecution witnesses corroborated each other with respect to defendant's guilt of robbery murder, including his identity as the actual killer. He insists, however, that CALJIC No. 2.27 was required because the credibility of certain witnesses was "highly suspect," and the

45

jury could have rejected all or some of their testimony and decided material facts based on only one witness.**25** Defendant invokes his federal constitutional rights to due process, a fair jury trial, and a reliable capital determination. (U.S. Const., 6th, 8th & 14th Amends.) The claim lacks merit even assuming defendant is correct that no objection was needed to preserve it for appeal. (See § 1259.)

Fairly understood, CALJIC No. 2.27 targets the situation in which the proponent of a particular fact *offers* the testimony of *only one witness* to establish it. In other words, when the proponent of evidence seeks to establish a material fact through the "testimony of a single witness" as to whom no corroboration is legally required, jurors may "believe" such testimony, and accept it as "sufficient for the proof of that fact," but they should do so only after "carefully review[ing] all the evidence upon which the proof of that fact depends." (*Ibid*.)

Nothing in CALJIC No. 2.27 concerns suspect witnesses in particular. Nor does CALJIC No. 2.27 address the anomalous situation in which multiple witnesses testify to the same material fact, but the jury is inclined to reject all but one of the witnesses' testimony. Otherwise, the instruction would be nothing

---

**25** CALJIC No. 2.27, which is virtually unchanged since the time of trial, provides as follows: "You should give the [uncorroborated] testimony of a single witness whatever weight you think it deserves. Testimony concerning any fact by one witness, which you believe, [whose testimony about that fact does not require corroboration] is sufficient for the proof of that fact. You should carefully review all the evidence upon which the proof of that fact depends."

We note that defendant does not challenge other standard instructions given at trial identifying Lupe as an accomplice as a matter of law, and subjecting his testimony to rules requiring corroboration. (CALJIC Nos. 3.10 [Accomplice Defined], 3.11 [Testimony of Accomplice Must Be Corroborated], 3.12 [Sufficiency of Evidence to Corroborate an Accomplice], 3.13 [One Accomplice May Not Corroborate Another], 3.14 [Criminal Intent Necessary to Make One an Accomplice], 3.16 [Witness Accomplice as Matter of Law], 3.18 [Testimony of Accomplice to be Viewed with Caution].)

more than a superfluous advisement to carefully consider the testimony of each witness in every case. (See *People v. Turner* (1990) 50 Cal.3d 668, 695-698 [trial court properly gave CALJIC No. 2.27 where defendant offered only his own uncorroborated testimony to defend against a robbery murder charge on grounds the killing was provoked and involved no pre-formed intent to steal]; *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 883-885 [holding that, in all criminal cases not requiring corroboration, a prophylactic instruction like CALJIC No. 2.27 must be given to aid defendants implicated by only the victim or other single witness].)

Applying these principles, we conclude no prejudicial error occurred. The proponent of the challenged evidence, the prosecution, did not seek to establish, by the testimony of only one witness, that defendant robbed and shot Hassan. On the contrary, the prosecution presented *more than one witness* to prove each material fact. Thus, as noted above, Lupe and Vallejo both identified defendant at trial as the person who killed Hassan during a robbery at the Casa Blanca Market. Both witnesses described defendant's statements essentially bragging about his role as the shooter shortly after the crime occurred. Lupe and Vallejo also testified that Jose admitted being defendant's partner in the actual robbery. Although no money was found, Lupe and his sister, Yesenia, testified that Jose admitted taking the victim's wallet from the store. Likewise, according to Lupe and Vallejo, defendant showed each of them the handgun that belonged to Hassan.

Of course, Lupe and Vallejo were not the only witnesses the prosecution used to prove defendant's guilt of robbery murder. Like Lupe, Amanda Garcia saw the perpetrators wearing face masks at the crime scene, and fleeing in Louis's car afterwards. Shorty and Shorty's wife Mariela buttressed Vallejo's testimony that defendant acquired a shotgun the night before the capital crime. The autopsy physician confirmed that Hassan suffered two shotgun blasts. Finally, Officer

47

McIntosh obtained the victim's handgun under circumstances corroborating Lupe's and Vallejo's testimony that defendant possessed it after the capital crime.

No reversible error occurred insofar as the trial court failed to give CALJIC No. 2.27, the single witness instruction, at defendant's trial.

### E.  Reasonable Doubt Instructions

Defendant contends that various standard instructions read by the trial court, when viewed alongside the standard reasonable doubt instruction also given at trial, impermissibly diluted the prosecution's burden of proof in violation of his federal and state constitutional rights to due process, trial by jury, and reliable capital trial.  (U.S. Const., 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15-17; see CALJIC No. 2.90 [presumption of innocence, reasonable doubt, and burden of proof].)  Based on a long line of authority, we disagree.

The first set of challenged instructions concerned the sufficiency of circumstantial evidence to prove three things: guilt (CALJIC No. 2.01), the special circumstance (CALJIC No. 8.83), and the mental state underlying the special circumstance (CALJIC No. 8.83.1).  These instructions made clear that all circumstances supporting an inference of guilt or a true special circumstance finding must be proved beyond a reasonable doubt; that circumstantial evidence cannot support either a conviction or a true special circumstance finding unless it cannot be reconciled with any other rational conclusion; that between two reasonable interpretations of the evidence, the one more consistent with innocence or an untrue special circumstance finding must be accepted; and that a reasonable interpretation prevails over an unreasonable one.

In short, the jury was properly told to " 'reject unreasonable interpretations of the evidence and to give defendant the benefit of any reasonable doubt.' " (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1355 (*McKinzie*).)  The

48

circumstantial evidence instructions did not permit, induce, or compel jurors to convict defendant or to sustain the special circumstance merely because he reasonably appeared to have committed the charged crimes. (*Ibid*.; see *People v. Jones, supra*, 57 Cal.4th 899, 972; *People v. Solomon* (2010) 49 Cal.4th 792, 826-827; *People v. Maury* (2003) 30 Cal.4th 342, 428; *People v. Millwee* (1998) 18 Cal.4th 96, 160.) Nor would the jury, when considering the circumstantial evidence instructions alongside the reasonable doubt instruction, somehow still have been misled about the requisite standard of proof. (*People v. Carey* (2007) 41 Cal.4th 109, 129-130 (*Carey*).) Defendant offers no persuasive reason to reconsider our decisions, and we decline to do so.

The second set of challenged instructions concerned the credibility and weight of evidence. (CALJIC Nos. 1.00 [outlining basic duties of judge and jury, including jurors' duty not to infer defendant is "more likely to be guilty than innocent" because he was prosecuted for the charged crimes], 2.21.1 [directing the "weighing" of discrepancies in witness testimony], 2.21.2 [allowing rejection of the whole testimony of a witness who was willfully false in one material part unless "the probability of truth" dictates otherwise], 2.22 [stating that conflicting testimony is to be weighed not by counting the witnesses on either side but by determining "the convincing force of the evidence"].)

Contrary to what defendant suggests, these instructions did not vitiate the reasonable doubt standard and allow jurors to decide each element of the charged crimes or special circumstance allegation simply by weighing the probabilities or considering the preponderance of the evidence. " 'Jurors are not reasonably likely to draw, from bits of language in instructions that focus on how particular types of evidence are to be assessed and weighed, a conclusion overriding the direction, often repeated in voir dire, instruction, and argument, that they may convict only if they find the People have proven guilt beyond a reasonable doubt.' " (*McKinzie,*

49

*supra*, 54 Cal.4th 1302, 1356-1357.)  No reasonable juror would have "parsed" these instructions and believed that the People had some lesser burden of proof. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1169; see *People v. Jones, supra*, 57 Cal.4th 899, 972-973; *People v. Streeter* (2012) 54 Cal.4th 205, 253; *Carey, supra*, 41 Cal.4th 109, 130-131.)**26**

### F. Validity of Felony-Murder Special Circumstance

Defendant challenges the validity of both the felony-murder special-circumstance statute and the lone special circumstance finding of felony murder underlying his death sentence.  (See § 190.2(a)(17).)  In defendant's view, capital punishment is disproportionate to culpability under both the Eighth Amendment of the United States Constitution and international law unless the People prove that "an actual killer had a culpable state of mind with regard to the murder." Defendant's descriptions of this alleged mental state vary.  He argues in his opening brief that a valid felony-murder special circumstance requires actual killers to possess at least a "reckless indifference to human life."  In his reply brief, however, defendant states that "[t]o impose a death sentence, there must be proof that the defendant, whether the actual killer or an accomplice, acted with an intent to kill."  Defendant is wrong on both counts.

---

**26**      Regarding forfeiture, the Attorney General recognizes that nothing compels us to conclude that defendant has failed to preserve his challenge to the reasonable doubt instructions here by not objecting on similar grounds below.  (See § 1259.) However, contrary to what the Attorney General asks us to do, we reach no different conclusion and find no procedural bar as to two instructions, CALJIC Nos. 2.21.1 and 2.21.2, which defendant requested at trial.  (See *People v. Belmontes* (1988) 45 Cal.3d 744, 781 (*Belmontes*) [propriety of instruction affecting substantial rights addressed on appeal where defendant requested it at trial]; see also *People v. DePriest* (2007) 42 Cal.4th 1, 52 (*DePriest*).)

The analysis starts from the premise that the death penalty is impermissibly excessive under the Eighth and Fourteenth Amendments where the defendant aids and abets a felony resulting in murder, but "does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." (*Enmund v. Florida* (1982) 458 U.S. 782, 797 (*Enmund*); see *id*. at pp. 784, 788 [prohibiting death for a getaway driver who waited outside the crime scene to help associates escape a robbery, and who did not join in the killings or possess either an intent to kill or other lethal mental state].) *Enmund*'s limits on death eligibility and sentencing are "categorical." (*Cabana v. Bullock* (1986) 474 U.S. 376, 386.) When such rules are stated in terms of the circumstances under which capital punishment is allowed, no constitutional violation occurs where the defendant "*in fact killed*, attempted to kill, or intended to kill." (*Ibid*., italics added.)

Accordingly, in the context of first degree felony murder, we have not conditioned capital punishment upon an intent to kill for actual killers. (*Belmontes, supra*, 45 Cal.3d 744, 794 ["The United States Supreme Court has made clear that felony murderers who *personally* killed may properly be subject to the death penalty in conformance with the Eighth Amendment — after proper consideration of aggravating and mitigating circumstances — even where no intent to kill is shown."].) The felony-murder special circumstance in section 190.2(a)(17) is valid absent any requirement that a defendant who actually killed during an enumerated felony acted with the intent to kill. (*People v. Anderson* (1987) 43 Cal.3d 1104, 1138-1148, overruling *Carlos v. Superior Court* (1983) 35 Cal.3d 131, 138-154.) We reject defendant's contrary claim. We also decline to reconsider *Anderson, supra*, 43 Cal.3d 1104 in this regard. (E.g., *People v. Stanley* (2006) 39 Cal.4th 913, 958; *People v. Young* (2005) 34 Cal.4th 1149, 1204; *People v. Diaz* (1992) 3 Cal.4th 495, 569.)

51

Likewise, we disagree with defendant that, to withstand constitutional scrutiny, the felony-murder special circumstance in section 190.2(a)(17) minimally requires a finding of "reckless indifference to human life" for actual killers lacking an intent to kill. In *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*), on which defendant relies, the court addressed whether an accomplice to a first degree felony murder who *neither* killed *nor* intended to kill could receive a death sentence consistent with the standards set forth in *Enmund, supra*, 458 U.S. 782. (See *Tison, supra*, 481 U.S. at pp. 139-141, 151-152 [allowing the death penalty for brothers who helped kidnap and rob the victims in an ongoing scheme to prevent the capture of their father, a dangerous fugitive, and who watched the father and another accomplice slaughter the victims].) *Tison* answered in the affirmative, holding that death is not disproportionate to culpability where there was "major participation in the felony committed, combined with reckless indifference to human life." (*Tison, supra*, 481 U.S. at p. 158.) Indeed, while noting that these two requirements are technically "separate[ ]," the court opined that some felonies carry such a grave risk of death that "one could properly conclude that any major participant necessarily exhibits reckless indifference to the value of human life." (*Tison, supra*, at p. 158, fn. 12; see *id*. at p. 157.)

Consistent with *Tison*, *supra*, 481 U.S. 137, the felony-murder special circumstance applicable to certain accomplices in section 190.2, subdivision (d), provides that "in the absence of a showing of intent to kill, an accomplice to the underlying felony who is not the actual killer, but is found to have acted with 'reckless indifference to human life and as a major participant' in the commission of the underlying felony," may be sentenced to death. (*People v. Estrada* (1995) 11 Cal.4th 568, 575; see *People v. Mil* (2012) 53 Cal.4th 400, 408-409.)

However, the principles and authorities that allow the death penalty for nonkiller accomplices to felony murder have no direct bearing on what is

minimally required to impose death on someone who actually kills during a felony and who possesses no lethal mental state. We recently made this point, as follows:

"The circumstance that the court concluded in *Tison*[,] [*supra*, 481 U.S. 137] that major participation in the underlying crime coupled with reckless indifference to human life was *sufficient* culpability for the death penalty to be imposed upon an aider and abettor does not signify that the high court concluded — or even implied — such circumstances are *necessary* in *all* cases to establish death eligibility, such as, for example, when the defendant is the actual killer. . . . [P]roof that a defendant who is guilty of felony murder was the actual killer of the victim — by itself — establishes the degree of culpability required to impose the death penalty. *Tison* and *Enmund*[,] [*supra*, 458 U.S. 472], which addressed different concerns, do not alter that established principle. Indeed, those cases, viewed properly, reinforce that rule." (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 193 (*Letner and Tobin*) [holding trial court need not instruct that felony-murder special circumstance requires the actual killer to be a major participant in the felony who acted with reckless disregard of human life]; accord, *People v. Taylor* (2010) 48 Cal.4th 574, 661 (*Taylor*).)

We reject defendant's further suggestion that *Kennedy v. Louisiana* (2008) 554 U.S. 407 (*Kennedy*), invalidates section 190.2(a)(17) as we have construed the statute here and in prior cases. In *Kennedy*, the high court held that the Eighth and Fourteenth Amendments prohibited imposition of the death penalty upon an adult male defendant for the violent rape of an eight-year-old girl "where the crime did not result, and was not intended to result, in death of the victim." (*Id*. at p. 413.) In so doing, the *Kennedy* court surveyed and weighed both legislative and societal opinion, and found a national consensus that death was disproportionate under such circumstances. (*Id*. at pp. 422-434.) The court also conducted its own proportionality analysis based on settled case law, including *Enmund, supra*, 458

53

U.S. 782, and *Tison, supra*, 481 U.S. 137, and on the underlying aims of the death penalty. (*Kennedy, supra*, 554 U.S. at pp. 421, 434-447.)

Contrary to what defendant claims, nothing in *Kennedy, supra*, 554 U.S. 407, undermines any decision of the United States Supreme Court or this court concerning the circumstances under which a death sentence is allowed for felony murderers who actually kill their victims. We discern no change in the law supporting our conclusion that an actual killer need not, in defendant's words, have "a culpable state of mind with regard to the murder." (See *Letner and Tobin, supra*, 50 Cal.4th 99, 197 [observing that *Kennedy, supra*, 554 U.S. 407, "did not overrule" *Tison, supra*, 481 U.S. 137, insofar as *Tison* permitted death for certain accomplices who did not kill or intend to kill in the course of felony murder].)

For all of these reasons, the Eighth and Fourteenth Amendments do not compel us to interpret the special circumstance in section 190.2(a)(17) in the manner defendant suggests for persons who actually kill in the course of a felony murder. Also, because defendant's death sentence complied with federal and state constitutional and statutory requirements in this respect, his related international law claim fails. (*People v. Watkins* (2012) 55 Cal.4th 999, 1033-1034 & fn. 17; *Taylor, supra*, 48 Cal.4th 574, 661.)

Here, consistent with the foregoing law, prosecution evidence showed that defendant actually killed Hassan in the course of an armed robbery at the Casa Blanca Market. The previous night, defendant borrowed a shotgun and rifle from his friend Shorty in order to commit a robbery and get some quick cash. The next day, defendant and his accomplices brought along two long guns — presumably, Shorty's shotgun and rifle — as they drove around looking for places to rob. During the drive, defendant, Jose, and Santos put on face masks. The group targeted the second store they saw, the Casa Blanca Market, because they

54

perceived a lower risk of being seen by potential witnesses. When defendant crossed the threshold, he was carrying the shotgun.

Once inside, Jose searched for cash. Hassan displayed a handgun. Jose, who apparently wielded the rifle, tried to shoot Hassan but could not do so. Defendant, who was already pointing his weapon at Hassan, reacted in a deadly manner. By his own admission, defendant warned Hassan that he would be shot if he resisted. After firing the shotgun once and seeing Hassan wounded on the floor, defendant continued the assault. He approached Hassan, thought he was smiling, and said he would be killed. Defendant kicked Hassan, and shot him a second time. Hassan died from two shotgun blasts, including one to the back.

Afterwards, defendant admitted that he shot and killed Hassan, and twice displayed the handgun he had taken in the process. Defendant seemed pleased about having shot Hassan, and helped celebrate the crime the night it occurred.

Accordingly, defendant's challenge to the felony-murder special circumstance and to its application here fails. We decline to reverse the judgment on this ground.

## V. PENALTY PHASE ISSUES

### A. Instructions on Witness Credibility

The trial court gave CALJIC No. 8.84.1, the standard instruction describing the jury's basic duties at the penalty phase, including the requirement that jurors accept and follow the law as stated by the court. The language in CALJIC No. 8.84.1 has not changed since the time of trial, and requires the jury, among other things, to "[d]isregard all other instructions given to you in other phases of this trial." As relevant here, the court also made two rulings at the penalty phase concerning standard instructions it had given at the guilt phase affecting the evaluation of witness credibility. First, the court declined to repeat those

55

credibility instructions. Second, contrary to the apparent preference of counsel on both sides, the court did not instruct that guilt phase instructions on witness credibility applied at the penalty phase.[27]

Defendant now claims the trial court withheld guidance the jury needed to properly evaluate biased and conflicting testimony given by members of Arcadia's family at the penalty phase (i.e., her sisters Maria and Elisabeth and brother-in-law Ramon). Such aggravating evidence involved defendant's alleged assault with a firearm upon Arcadia and six relatives, including young Marco, four months before the capital crime. (See §§ 190.3, factor (b) (factor (b)) [other violent criminal activity], 245, subd. (a)(2) [assault with a firearm].) Citing no specific constitutional provisions, defendant asserts violations of his federal and state rights to a fair penalty trial and reliable death verdict.[28]

In general, the trial court need not repeat or highlight "generic" guilt phase instructions on witness credibility at the penalty phase as long as the jury can properly infer that these instructions continue to apply. (*People v. Brown* (1988) 46 Cal.3d 432, 460; see *People v. Rogers* (2006) 39 Cal.4th 826, 905 [reasonable

---

**27** The relevant instructions were CALJIC No. 2.00 (defining direct and circumstantial evidence, and allowing reasonable inferences to be drawn from the evidence), CALJIC No. 2.01 (regulating the use and sufficiency of circumstantial evidence), CALJIC No. 2.20 (authorizing the jury to decide the credibility of witnesses and identifying relevant factors), and CALJIC No. 2.22 (concerning the weighing of conflicting testimony).

**28** The trial court gave other standard instructions, not challenged on appeal, concerning the evidence of assault with a firearm under factor (b). These instructions required proof beyond a reasonable doubt to consider such crime in aggravation (CALJIC No. 8.87), defined the crime of assault (CALJIC No. 9.00), defined assault with a firearm (CALJIC No. 9.02), required a concurrence of act and general intent for assault with a firearm (CALJIC No. 3.30), and defined reasonable doubt (CALJIC No. 2.90).

doubt].) Such is the case where the instructions are not limited by their terms to the guilt phase or contradicted by other advisements at the penalty phase. (*People v. Sanders* (1995) 11 Cal.4th 475, 561; *People v. Wharton* (1991) 53 Cal.3d 522, 600.) However, penalty jurors cannot reasonably be expected to apply guilt phase instructions on credibility where they are categorically told to disregard them and no reinstruction is given. Under the latter circumstances — which existed at defendant's trial — error occurs. (*People v. Lewis* (2008) 43 Cal.4th 415, 535 (*Lewis*); *People v. Moon* (2005) 37 Cal.4th 1, 36-37 (*Moon*).)

Nevertheless, defendant has not shown that the instructional omission resulted in prejudice as to the jury's evaluation of the evidence of assault with a firearm under factor (b). (E.g., *People v. Brasure* (2008) 42 Cal.4th 1037, 1073 (*Brasure*); *Lewis, supra*, 43 Cal.4th 415, 535-536; *Moon, supra*, 37 Cal.4th 1, 37-39; *People v. Carter* (2003) 30 Cal.4th 1166, 1220 (*Carter*).) Events leading up to the shooting were undisputed. Consistent with statements made to Officer Rapozo at the crime scene, all three witnesses testified that the shooting involved a quarrel over child custody. Arcadia became concerned when she learned defendant had taken their son Marco from the family home while she was gone. Arcadia and five other people drove in the Thunderbird to defendant's residence. Arcadia and defendant argued outside while Maria and Elisabeth placed Marco in the car. Gunshots were fired, the victims drove away, and the police were called.

Forensic evidence corroborated witness testimony about a shooting in front of defendant's home. Arriving shortly after the crime apparently occurred, Officer Rapozo found shell casings in the road nearby. The casings came from a pistol, which one of the witnesses, Ramon, reported seeing in defendant's hand as he aimed at the occupied car. Also, bullet holes, one of which was not far from the ground, were found in a neighboring building. This evidence supported Maria's testimony that defendant pointed the gun downwards toward the car.

All witnesses also agreed on the key point that defendant shot at the Thunderbird after everyone, including Marco, was inside. Before hearing gunfire, Maria and Ramon both saw defendant point a gun at the car. Elisabeth did not see the gun or where it was aimed, but she knew defendant was the shooter because no other culprit was nearby. Maria, Elisabeth, and Ramon each heard multiple shots.

Defendant suggests, however, that any variation in testimony necessarily means that the witnesses falsely implicated him in the shooting, and that they struggled to follow a concocted storyline at trial. To the contrary, there was nothing artificially consistent about their accounts. For instance, Maria testified that defendant took Marco from Elisabeth, and that Elisabeth got Marco a second time before carrying him to the car. Elisabeth disputed this point. Also, Maria and Ramon both saw a gun, but described it differently. Elisabeth never saw a gun and could provide no such description. Only Ramon reported seeing defendant seven or eight feet from the car when the shooting occurred. These inconsistencies and discrepancies are fairly minor, and seem to be the kind commonly found among eyewitnesses to an unforeseen and startling event.

Finally, it bears emphasis that the relevant instructional error concerned credibility determinations — a task lay jurors would be expected to understand and perform in their daily lives. As the case law makes clear, it seems far-fetched to assume that the jury, in assessing factor (b) evidence: (1) placed great weight on "a general direction to disregard the guilt phase instructions," (2) "acted contrary to common sense" in evaluating credibility, and (3) abandoned "commonly held precept[s]" regarding witnesses' motivation to lie or any other bias in performing that function. (*Brasure, supra*, 42 Cal.4th 1037, 1073 [finding no prejudice under circumstances similar to the present case].)

58

Thus, under any applicable standard, the lack of proper instruction on witness credibility was harmless as to both the factor (b) determination and the resulting penalty verdict. We will not reverse the judgment on this ground.

## B. Request to Modify and Supplement Standard Instructions

Defendant claims the trial court erroneously denied his request to modify one standard instruction, CALJIC No. 8.88, and to give several special instructions concerning the death penalty. In doing so, the court purportedly violated his federal and state constitutional rights to due process, a fair jury trial, and a reliable capital determination. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15.) Under settled law, defendant is wrong.[29]

### 1. *CALJIC No. 8.88*

This standard instruction, which is virtually unchanged since the time of trial, concerns the weighing of aggravation and mitigation and selection of the appropriate penalty. At issue here is the last sentence, which states: "To return a judgment of death, each of you must be persuaded that the aggravating circumstances are *so substantial* in comparison with the mitigating circumstances that it *warrants* death instead of life without parole." (CALJIC No. 8.88, italics added.) Defendant's proposed modification would have qualified the italicized terms by advising jurors that aggravation must "outweigh" mitigation, and that death must be "appropriate." Otherwise, he contends, the instruction invited the jury to exercise its sentencing discretion in a skewed and arbitrary manner.

---

[29]    As agreed by the parties, the trial court granted defendant's request for a special instruction concerning his constitutional right not to testify at the penalty trial. This instruction told jurors to avoid drawing any inference from defendant's failure to testify, and to prevent this matter from affecting their deliberations.

However, the standard version of CALJIC No. 8.88, read as a whole, accurately describes the individualized, normative nature of the sentencing determination, and properly guides the jury's discretion in this regard. Language preceding the challenged sentence states, among other things, that "[i]n *weighing* the various circumstances you determine under the relevant evidence which penalty is justified and *appropriate* by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." (*Ibid.*, italics added.) Thus, as in other cases, we reject defendant's claim that CALJIC No. 8.88, including the "so-substantial" phrase, is vague and uncertain. The instruction also makes clear that a death sentence is "warranted" *only* if it is appropriate in light of the aggravating and mitigating evidence at trial. (*McKinzie, supra*, 54 Cal.4th 1302, 1361; *Famalaro, supra*, 52 Cal.4th 1, 43; *People v. Butler* (2009) 46 Cal.4th 847, 874 (*Butler*); *People v. Page* (2008) 44 Cal.4th 1, 56.)

## 2. *Death as the Most Severe Penalty*

Defendant requested a special instruction stating that death is the most severe penalty under the law. On its face, the instruction sought to dispel any impression expressed during jury selection that a sentence of life without the possibility of parole was "actually worse" than a death sentence.[30] However, the trial court was not required to give this instruction and did not err in refusing to do

---

**30**     The proposed instruction read as follows: "Some of you expressed the view during jury selection that the punishment of life in prison without possibility of parole was actually worse than the death penalty. [¶] You are instructed that death is qualitatively different from all other punishment and is the ultimate penalty in the sense of the most severe penalty the law can impose. Society's next most serious punishment is life in prison without possibility of parole. [¶] It would be a violation of your duty, as jurors, if you were to fix the penalty at death with a view that you were thereby imposing the less severe of the two available penalties."

60

so. Though it is a correct statement of law to describe death as the ultimate penalty, " 'the penalty trial itself and the jury instructions given, particularly CALJIC No. 8.88, make clear that the state views death as the most extreme penalty.' " (*People v. Jones* (2012) 54 Cal.4th 1, 81; accord, *People v. Tate* (2010) 49 Cal.4th 635, 707.) The court properly avoided such redundancy here. (*People v. Cook* (2007) 40 Cal.4th 1334, 1363.)

### 3. *Deterrent Effect of Death Penalty*

Contrary to what defendant now claims, the trial court did not err in refusing to instruct the jury not to consider the deterrent effect of the death penalty. Defendant speculates that because certain jurors mentioned deterrence on their written questionnaires, such a cautionary instruction was necessary.[31] He does not contend, however, that either party raised the issue at trial. Nor does he address the inherent risk that such an instruction would have called the jury's attention to irrelevant matters it otherwise would have ignored. Indeed, under the court's instructions, the jury was told to consider only the statutory aggravating and mitigating factors in deciding penalty. (CALJIC No. 8.85.) "The trial court was not required to furnish an instruction exhorting the jury to refrain from considering factors which, under a reasonable understanding of the jury instructions, it should have known were improper to consider." (*People v. Welch* (1999) 20 Cal.4th 701, 766; accord, *People v. Brown* (2003) 31 Cal.4th 518, 566; *Carter, supra*, 30 Cal.4th 1166, 1223-1224.)

---

**31** The proposed instruction read as follows: "In deciding whether death or life imprisonment without the possibility of parole is the appropriate sentence, you may not consider for any reason whatsoever the deterrent or non-deterrent effect of the death penalty or the monetary cost to the state of execution or of maintaining a prisoner for life."

#### 4. *Instructions Highlighting Mitigating Factors*

As set forth below, the trial court declined to give several one-sentence instructions that defendant requested concerning factors he viewed as particularly mitigating at the penalty phase. However, a capital defendant's right to present relevant mitigating evidence, and to urge its consideration by the jury, does not encompass "a concomitant right to instruction on particularized mitigation." (*People v. Cox* (1991) 53 Cal.3d 618, 676.) In other words, the court need not present a partial list of potential mitigating factors or otherwise identify certain evidentiary matters as extenuating. (*People v. Howard* (1988) 44 Cal.3d 375, 442 [reasoning that such instructions do not illuminate "the legal standards at issue"].)

Also, to the extent proposed instructions would have directed the jury to consider "all evidence in mitigation from whatever source," they merely duplicate standard instructions given at the penalty phase. (*People v. Jones, supra*, 54 Cal.4th 1, 83; accord, *People v. Gonzales* (2012) 54 Cal.4th 1234, 1297; *People v. Lenart* (2004) 32 Cal.4th 1107, 1135.) Specifically, CALJIC No. 8.85, given here, allows the jury to consider any extenuating circumstance of the crime, even if not a legal excuse for the crime, and any sympathetic or other aspect of defendant's character or record he offered as a basis for a sentence less than death. (See § 190.3, factor (k); *People v. Easley* (1983) 34 Cal.3d 858, 878, fn. 10.)

Thus, the court in this case did not err by declining to instruct the jury on the following points: (1) "the effect of defendant's execution on his family and friends" (see, e.g., *People v. Lee* (2011) 51 Cal.4th 620, 656-657 & fn. 21), (2) "defendant's potential for rehabilitation and leading a useful and meaningful life while incarcerated" (see, e.g., *People v. Catlin* (2001) 26 Cal.4th 81, 173), (3) the "exercise [of] mercy on behalf of the defendant" (see, e.g., *Butler, supra*, 46 Cal.4th 847, 875), (4) "any lingering doubts" about defendant's guilt (see, e.g., *Boyer, supra*, 38 Cal.4th 412, 487, and (5) the lack of evidence that "defendant has

been convicted of any prior felony" (see, e.g., *People v. Jones* (2003) 30 Cal.4th 1084, 1124).

## C. Constitutionality of Death Penalty Law

Defendant raises various challenges under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the validity of the statutory scheme under which he was sentenced to death. He does so to preserve the same issues for federal review. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 303-304 & fn. 22.) Defendant acknowledges that we have rejected these claims before. We do so again here.

The homicide and death penalty statutes adequately narrow the class of first degree murderers eligible for the death penalty. The statutory scheme is not overbroad or arbitrary in this regard. (*Boyer, supra*, 38 Cal.4th 412, 483.)

Section 190.3, factor (a) (the circumstances of the capital crime) is not so broad as to be applied in a wanton or freakish manner. (*People v. Garcia* (2011) 52 Cal.4th 706, 763.) Nor is factor (b) of the same statute (the defendant's other violent criminal activity) irrational or invalid insofar as it permits consideration of unadjudicated crimes. (*People v. Beames* (2007) 40 Cal.4th 907, 934.)

The death penalty law does not lack adequate safeguards insofar as it does not require written findings either beyond a reasonable doubt or by any other standard or burden of proof that an aggravating circumstance has been proved (other than factor (b)), that the aggravating factors outweigh the mitigating factors, or that death is the appropriate penalty. (*People v. Avila* (2009) 46 Cal.4th 680, 724.) Likewise, the jury need not be told that there is no burden of proof at the penalty phase. (*People v. McKinnon* (2011) 52 Cal.4th 610, 697-698.)

Nor are the statute and related standard instructions flawed in not demanding juror unanimity on any aggravating factor, including factor (b), and in

63

not authorizing a presumption favoring the imposition of a life sentence. (*DePriest, supra*, 42 Cal.4th 1, 60.)

For reasons we have explained above, and which need not be repeated here, we reject defendant's broad attack on standard instructional language in CALJIC No. 8.88 concerning the weighing of aggravating and mitigating factors and the appropriateness of a death sentence. (*McKinzie, supra*, 54 Cal.4th 1302, 1361.)

Use in the sentencing factors of such adjectives as "extreme" (§ 190.3, factors (d), (g)) and "substantial" (*id.*, factor (g)) does not create an improper barrier to the consideration of mitigating evidence. (*People v. Morrison* (2004) 34 Cal.4th 698, 730.) An instruction was not required as to which sentencing factors are aggravating, which are mitigating, and which could be either mitigating or aggravating. Also, language in CALJIC No. 8.85 to consider "[w]hether or not" certain mitigating factors were present did not impermissibly suggest that the absence of such factors was aggravating. (*People v. Jones, supra*, 54 Cal.4th 1, 87.) Nor must the trial court delete any inapplicable mitigating factors from CALJIC No. 8.85. (*People v. Cook* (2006) 39 Cal.4th 566, 618.)

The death penalty law need not provide comparative or intercase proportionality review. (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1067.) Neither does a judgment of death under the statutory scheme violate international law. (*Id.* at p. 1066.) There is no equal protection violation insofar as the statutory scheme fails to provide capital defendants certain procedural guarantees afforded to noncapital defendants. (*Fuiava, supra*, 53 Cal.4th 622, 732.)

### D. Cumulative Error and Prejudice

Defendant contends that the combined effect of the guilt and penalty errors asserted on appeal requires reversal of the entire judgment even if no error is prejudicial on its own. For reasons we have explained, any errors we have found

or assumed at either phase of trial were harmless under any applicable standard. Any conceivable cumulative prejudicial effect does not establish that defendant was denied due process of law or a fair trial.  Therefore, the claim lacks merit.

## VI.  DISPOSITION

The judgment is affirmed in its entirety.


**BAXTER, J.**


**WE CONCUR:**

CANTIL-SAKAUYE, C.J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Contreras

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S058019
**Date Filed:** December 12, 2013

_____

**Court:** Superior
**County:** Tulare
**Judge:** Patrick J. O'Hara

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, and Denise Anton, Deputy State Public Defender, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Denise Anton
221 Main Street, 10th Floor
San Francisco, CA  94105
(415) 904-5600

Christina Hitomi Simpson
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 323-1213