Filed 4/21/14  P. v. Delgado CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE, | B244391 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. PA064403) |
| v. | |
| JOSE JESUS DELGADO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of the County of Los Angeles, Daniel B. Feldstern, Judge.  Affirmed.

Kathy Moreno, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Stacy S. Schwartz, Deputy Attorney General, for Plaintiff and Respondent.

## INTRODUCTION

A jury found defendant and appellant Jose Jesus Delgado guilty of second degree murder (Pen. Code, § 187, subd. (a)), and found true the allegation that he personally and intentionally discharged a handgun causing great bodily injury and death (Pen. Code, § 12022.53, subd. (d)). The trial court sentenced defendant to 40 years to life in state prison. On appeal, defendant contends that the trial court erred in admitting expert gang testimony, restricting cross examination of witnesses, and making "asymmetrical evidentiary rulings." We affirm.

## BACKGROUND

In March 2009, Edgar Moreira and Keyri Martinez were dating and had a young son together. Moreira did not live with Martinez and their son. He lived in a house he rented with Miguel Contreras. Moreira and defendant were good friends. Martinez also knew defendant—Moreira introduced defendant to Martinez as "Bones." Martinez had known defendant for about six years, and they once lived in the same neighborhood.

During the afternoon on March 25, 2009, Moreira, Martinez, and their son went to a swap meet. On the way to the swap meet, Moreira received a number of telephone calls from "Bones." Once at the swap meet, Moreira received another phone call from Bones. During that conversation, Moreira said, "I'm at the swap meet." In a second conversation with Bones, Moreira identified the specific aisle he was in at the swap meet, and Martinez saw Bones approaching from the end of the aisle.

Moreira and Bones spoke for about five minutes. Martinez was within 10 feet of the men during the conversation. Moreira's and Bones's demeanors suggested to Martinez that the men were arguing. Moreira appeared to Martinez to be "upset" and Bones appeared to be "disoriented," a condition Martinez had seen Bones in five to seven times previously.

Martinez approached Moreira and Bones to retrieve her son, and heard Moreira say to defendant, "I'm not a bitch. You know I'm not a bitch. If you want, let's take this shit outside." Defendant responded, "No, dog. You know you're my dog. I love you.

2

We're cool." As defendant spoke, he put his arm around Moreira's shoulder and rubbed the top of his head. Moreira appeared to calm down. Bones started walking towards the exit and Moreira followed him. Martinez pulled Moreira's shirt and said, "Hey, we're here," and Moreira stayed with Martinez and their son. Later, Martinez, Moreira, and their son returned to Moreira's house.

After returning home, Moreira received 14 phone calls, five of which he answered. According to Martinez, all five conversations took place inside, and not outside, the house. Martinez asked Moreira why the phone was ringing so much. Moreira responded, "It's Bones. I don't know what the fuck he wants." Moreira, Martinez, and their son spent the night at Moreira's house.

About 6:30 a.m. the next morning, Martinez heard knocking on the bedroom window followed by someone outside the window saying, "Hey, Chunky." Martinez testified that Moreira was known by the name "Chunky." When he was younger, Moreira was known as "Pumpkin." Martinez then heard the person outside say, "Hey, Chunky. Do me a favor." Moreira responded, "Don't screw with me, man. It's too early." The person outside said, "Do me a favor. Open the door. I'm high." Moreira responded, "Don't screw with me, man. It's too early. I have my child." The person again said, "Do me a favor. Open the door. I'm high." Moreira responded, "Wait for me, Bones. I'm going to open the door." The prosecutor asked Martinez if she recognized the voice of the person who was outside. Martinez said, "Yes." The prosecutor asked her how she recognized the voice. Martinez responded, "I know Bones, and I just recognized his voice." Martinez never saw Bones that morning, she only heard his voice.

Moreira walked out of the bedroom and Martinez followed him. Moreira told Martinez to stay. Moreira walked into the living room, and Martinez heard him open the front door and metal screen door. After Moreira opened the doors, Martinez heard Bones shout, "Fuck you, motherfucker." Martinez then heard five to seven consecutive gunshots. Martinez checked on her son and then went into the living room where she saw Moreira in a pool of blood on the floor.

Both doors were still open, and Martinez walked outside. Martinez looked around, but did not see anyone. Martinez returned to the house and checked Moreira's neck for a pulse. Martinez did not feel a pulse.[1] Martinez did not know what to do, and walked in and out of the house for about five minutes. Martinez went to Contreras's room. Contreras's one-year-old son was crying and Contreras appeared to be having a panic attack. Martinez told Contreras that Bones had killed Chunky.[2] Contreras and his son left.

After Contreras and his son left, Martinez searched the house for a phone and called her friend Sandra Guerrero. Martinez told Guerrero that "Bones killed Chunky," and asked her to pick up Martinez's son.[3] Guerrero arrived about 10 minutes later. Martinez asked Guerrero to call the police. After Guerrero left with Martinez's son, Martinez called the police. Martinez called Guerrero before she called 911 because she was concerned for her son—she did not want him "going through all that" when the police arrived. Martinez believed that Moreira was dead when she called Guerrero and the police. After the shooting and before the police arrived, Martinez did not move anything in the residence.

Martinez was not sure if she told the 911 operator who killed Moreira. She told the police that she knew the shooter's first name—"Jose," and nickname—"Bones." Later that morning, about 9:00 a.m., Los Angeles Police Department Detective Humberto Farjardo interviewed Martinez. Martinez told the detective that Bones killed Chunky. She identified defendant from a six-pack photographic lineup, and wrote next to his photograph, "This guy goes by Bones, Bryant Street." Martinez knew defendant and Moreira to be members of the Bryant Street gang. Detective Farjardo had Martinez

---

[1]   The Los Angeles Department of Coroner determined that Moreira's cause of death was multiple gunshot wounds.

[2]   Contreras testified that Martinez told him that Moreira had been shot and was dead. He did not testify that she told him that Bones had killed Chunky.

[3]   Guerrero testified that Martinez told her that "Chunky got shot." Martinez did not say that Bones shot Moreira.

4

"detail" for him what had happened at the swap meet. Martinez did not say that she heard Moreira say, "Let's take this shit outside."

About 11:30 a.m. on the morning Moreira was shot, defendant entered the Burger Crave restaurant. Defendant was shaking, mumbling, and sweating profusely. He walked through the restaurant to the restaurant's patio where he sat for a while before reentering the restaurant and ordering an orange drink. As his drink was being prepared, defendant dropped to the floor and began doing pushups.

Defendant took his drink and sat at a table. Shortly thereafter, defendant "very violently" banged his head against the window about three times. The window shattered. Defendant suffered a "big gash" on his forehead and bled profusely. Defendant walked out of the restaurant, and the restaurant's owner called the police. Defendant walked to the corner where he got down on his hands and knees and "head-butt[ed]" the cement four or five times. Defendant got up and started to walk back towards the restaurant. One of the restaurant's customers locked the door. Defendant walked across the street to a fire station. When he reached the fire station, two police cars pulled up. The firemen sat defendant down and tried to treat him. Defendant was fidgety and combative and would not allow the firemen to treat his injuries. Defendant had to be held down.

Los Angeles Police Department Sergeant Stephen Gomez testified that he came into contact with defendant on August 20, 2008. Sergeant Gomez "ascertained" that defendant was a member of the Bryant Street gang. Defendant told Sergeant Gomez that his moniker was "Bones." Sergeant Gomez was familiar with the Bryant Street gang. "Bryant St" was tattooed on the back of defendant's neck. "BST" which represented Bryant Street was tattooed on defendant's abdomen. Sergeant Gomez's contact with defendant was not gang-related.

Los Angeles Police Department Detective John Sawada testified as the prosecution's expert on the Bryant Street gang. According to Detective Sawada, Moreira was a Bryant Street gang member and had the monikers "Pumpkin" and "Chunky" or "Chunk." The detective knew that defendant was a member of the Bryant Street gang and that his moniker was "Bones." No other Bryant Street gang member had the same

5

moniker.  Defendant had been a Bryant Street gang member since 1993, when he was 16 years old.  Defendant was older than Moreira and a more senior member of the Bryant Street gang.

According to Detective Sawada, if one gang member disrespected another gang member, it would be seen as an act of defiance.  The "probable consequences" for such an act could range from a "beat-down" to murder.  Seniority in a gang was determined by the length of time a person was a member of the gang.  An older gang member received or deserved more respect than a younger member.  If a younger gang member challenged a senior member, the challenge would be seen as an act of defiance and disrespect and would not be tolerated.  Likewise, a younger gang member's failure to follow an order from a senior member would not be tolerated.  It would be a sign of disrespect if a younger gang member said to a senior gang member, "I'm not a bitch.  You know I'm not a bitch.  If you want, let's take this shit outside."  The statement, "You have a choice: You're either with me or not," by a senior gang member to a younger member was an ultimatum that meant, "You're either going to go along with the program or you're going to basically suffer the consequences."  The consequences could be anything from a "beat-down" to murder.

At trial, the prosecutor asked defendant's sister, Veronica Delgado, "Now, is your brother a Bryant Street gang member?"  She responded, "Yes."  The prosecutor asked her, "Do people know him as Bones?"  She responded, "Yes

## DISCUSSION

### I.    Admission of Detective Sawada's Expert Gang Testimony

Defendant contends that the trial court erred in admitting Detective Sawada's expert witness testimony about gangs because there was no evidence independent of his testimony that Moreira's murder was gang-related.  Defendant further contends the trial court erred in admitting Detective Sawada's testimony about the gang significance of the phrases "let's take this shit outside" and  "you're either with me or you're against me" because it was not properly the subject of expert witness testimony.  Finally, defendant

6

contends that the trial court's admission of Detective Sawada's testimony about the "gang mentality regarding disrespect and punishment" violated *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*).

### A.     Admission of Gang Evidence

The "admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged. [Citation.]" (*People v. Williams* (1997) 16 Cal.4th 153, 193.) "[E]ven where gang membership is relevant, because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it. [Citation.]" (*Ibid.*) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.]" (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.) "[I]n a gang-related case, gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect. [Citation.]" (*People v. Williams, supra,* 16 Cal.4th at p. 193.)

"A trial court's admission of evidence, including gang testimony, is reviewed for abuse of discretion. [Citations.] The trial court's ruling will not be disturbed in the absence of a showing it exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a miscarriage of justice. [Citation.]" (*People v. Avitia* (2005) 127 Cal.App.4th 185, 193.)

Gang evidence was relevant to prove the identity and motive of the shooter in this case. Martinez testified that she recognized the voice of the person outside the bedroom window as Bones's voice. Martinez testified that Moreira identified the person who spoke outside the bedroom window as "Bones." That defendant was a Bryant Street gang member with the moniker "Bones" thus was relevant to proving the identity of the shooter. (*People v. Hernandez, supra,* 33 Cal.4th at p. 1049.) Testimony that a gang

7

member would punish a subordinate gang member for disrespect was relevant to proving the shooter's motive. Defendant and Moreira argued at the swap meet. Moreira, a member of the Bryant Street gang junior to defendant, said to defendant, "I'm not a bitch. You know I'm not a bitch. If you want, let's take this shit outside." According to Detective Sawada, such an utterance to a senior gang member would be a sign of disrespect. The detective testified that the consequences for one gang member's disrespect of another gang member could range from a "beat-down" to murder. That a junior member of a gang could be murdered for showing disrespect to a senior member was relevant to proving a motive for Moreira's murder. (*Ibid.*) The trial court did not abuse its discretion in admitting Detective Sawada's expert gang testimony as it was relevant to provide identity and motive. (*People v. Avitia, supra,* 127 Cal.App.4th at p. 193.)

### B.   *Evidence Code Section 801*

Defendant contends that Detective Sawada's testimony concerning the meaning of the phrases, "let's take this shit outside" and "you're either with me or you're against me"[4] were not the proper subject of expert witness testimony under Evidence Code section 801. According to defendant, such commonly used phrases needed no explanation and "in no way assisted the jury in determining guilt or innocence."

Evidence Code section 801, subdivision (a) permits expert testimony on subjects "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." We review the admission of expert witness testimony under Evidence Code section 801 for an abuse of discretion. (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 902.)

Detective Sawada did not testify to the meaning of the phrase "let's take this shit outside." With respect to the phrase "you're either with me or not," the detective testified that the phrase was an ultimatum to either go along with the program or suffer the

---

[4]     The phrase about which Detective Sawada testified was, in full, without paraphrasing, "You have a choice:  you're either with me or not."

consequences. The significance of Detective Sawada's testimony was not the translation of either phrase as if it were some type of special gang terminology. Instead, the significance of the detective's testimony was to explain for the jury that when a gang member uttered such a disrespectful phrase or defied such an ultimatum the consequence could be murder—a consequence likely beyond the jury's common experience with either phrase. Accordingly, the trial court did not abuse its discretion in admitting the testimony. (*People v. Kovacich, supra,* 201 Cal.App.4th at p. 902.)

       *C.*     People v. Kelly

According to defendant, "Officer Sawada's testimony, reduced to its essence, was that a particular form of behavior by a younger gang member (disrespect, as interpreted again by Sawada) would lead to a particular violent consequence or punishment meted out by a more senior gang member." Such "predictive" testimony, defendant contends, was inadmissible under *Kelly, supra,* 17 Cal.3d 24.

In *Kelly, supra,* 17 Cal.3d 24, the California Supreme Court "held that evidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test. The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community. (*Id.* at p. 30].) The second prong requires proof that the witness testifying about the technique and its application is a properly qualified expert on the subject. (*Ibid.*) The third prong requires proof that the person performing the test in the particular case used correct scientific procedures. (*Ibid.*)" (*People v. Bolden* (2002) 29 Cal.4th 515, 544.) "[A] technique may be deemed 'scientific' for purposes of *Kelly*/*Frye*[5] if 'the unproven technique or procedure appears in both name and description to provide some definitive

---

[5]     *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013 (*Frye*).

truth which the expert need only accurately recognize and relay to the jury.' [Citation.]"[6] (*People v. Leahy* (1994) 8 Cal.4th 587, 606.)

Detective Sawada's expert gang testimony was not and did not purport to be scientific evidence. Accordingly, it was not subject to the *Kelly* test. Moreover, the California Supreme Court has held that a gang expert may testify to the "habits" of a criminal street gang. (*People v. Gardeley* (1996) 14 Cal.4th 605, 617.)

## II.     Cross-Examination of Sergeant Gomez

Sergeant Gomez testified that he ascertained from a field interview of defendant that defendant was a member of the Bryant Street gang, that his moniker was "Bones," and that he had a Bryant Street tattoo on the back of his neck. Defendant contends that the trial court violated his constitutional rights of confrontation and due process by improperly restricting his cross-examination of Sergeant Gomez concerning the circumstances of that field interview, thus preventing him from impeaching the officer's testimony. Any error by the trial court was harmless.

The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" (U.S. Const., 6th Amend.; *Pointer v. Texas* (1965) 380 U.S. 400 [extending Sixth Amendment to state proceedings through Fourteenth Amendment].) To effectuate this guarantee, the trial court must afford a criminal defendant the opportunity for effective cross-examination of adverse witnesses. (*Delaware v. Fensterer* (1985) 474 U.S. 15, 19-20; *People v. Carter* (2005) 36 Cal.4th 1114, 1172.) "[T]he cross-examiner is not only permitted to . . . test the witness'[s] perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 316.) Accordingly, "a criminal

---

[6]     "In 1993, the United States Supreme Court held that the Federal Rules of Evidence had superseded *Frye* (*Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579, 587 [113 S.Ct. 2786, 125 L.Ed.2d 469]), and our state law rule is now referred to simply as the *Kelly* test or rule. [Citation.]" (*People v. Bolden, supra,* 29 Cal.4th at p. 545.)

defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' [Citation.]" (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 680.)

"'"Confrontation clause violations are subject to federal harmless-error analysis under *Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824]." [Citation.] We ask whether it is clear beyond a reasonable doubt that a rational jury would have reached the same verdict absent the error.' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1159.)

During her cross-examination of Sergeant Gomez, defense counsel began to ask the officer about defendant's mental state at the time the officer contacted defendant and "ascertained" the gang information. Defense counsel asked Sergeant Gomez, "And at that time he told you that he was jumping off—" The prosecutor objected that the question called for hearsay. The trial court sustained the objection, and then addressed the matter at sidebar on defense counsel's request.

At sidebar, defense counsel stated that she intended to use the evidence, in part, to challenge whether there had been "actual admissions." That is, as phrased by the trial court, "how could they possibly get the personal information from [defendant] if he was out of his mind[?]" Defense counsel represented that the contact between Sergeant Gomez and defendant resulted in defendant being placed under a mental health hold pursuant to Welfare and Institutions Code section 5150. Sergeant Gomez's field identification card apparently reflected statements by defendant as follows: "Entered person's reporting backyard, jumped onto an off house roof, voices going to get him, scared, cocaine, voices going to kill him." The prosecutor stated that the sole purpose of Sergeant Gomez's testimony was to establish that defendant was a gang member and had a moniker. The trial court again sustained the objection.

Even assuming that the trial court erred in excluding the proffered evidence, any such error was harmless under *Chapman v. California, supra,* 386 U.S. at page 24. That

11

is, even if the proffered evidence had been admitted and Sergeant Gomez's testimony had been entirely impeached, Sergeant Gomez's testimony was merely cumulative of other unimpeached testimony that showed that defendant was an active Bryant Street gang member with the moniker "Bones." Martinez, Detective Sawada, and defendant's sister all testified that defendant was a member of the Bryant Street gang and that his moniker was "Bones."

### III. Cross-Examination of Martinez

Defendant contends that the trial court violated his constitutional rights of confrontation and to present a defense[7] when it restricted his cross-examination and impeachment of Martinez by excluding evidence that Martinez made statements to a police officer the morning of the shooting that were inconsistent with her trial testimony. The trial court did not err.

"To be relevant, evidence must have some 'tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.' (Evid. Code, § 210.) This definition includes evidence 'relevant to the credibility of a witness.' (*Ibid.*; see Evid. Code, § 780 [the fact finder may consider matters relevant to the truthfulness of the witness's testimony].) [¶] Conversely, a matter is 'collateral' if it has no logical bearing on any material, disputed issue. [Citation.] A fact may bear on the credibility of a witness and still be collateral to the case. [Citations.]" (*People v. Contreras* (2013) 58 Cal.4th 123, 152 (*Contreras*).)

A "trial court has wide latitude under state law to exclude evidence offered for impeachment that is collateral and has no relevance to the action. [Citations.] This exercise of discretion necessarily encompasses a determination that the probative value of such evidence is 'substantially outweighed' by its prejudicial, 'confusing,' or time-consuming nature. (Evid. Code, § 352; see *People v. Lewis* (2001) 26 Cal.4th 334, 374-375 [110 Cal.Rptr.2d 272, 28 P.3d 34] [noting that Evid. Code, § 352 gives trial court

---

[7] Defendant does not develop his claim that the trial court violated his right to present a defense.

12

broad power to prevent ""nitpicking"" over ""collateral credibility issues""].)" (*Contreras, supra,* 58 Cal.4th at p. 152.)

"Also, as long as the excluded evidence would not have produced a ""significant different impression"" of the witness's credibility, the confrontation clause and related constitutional guarantees do not limit the trial court's discretion in this regard. ([*People v.*] *Dement* (2011) 53 Cal.4th 1, 52 [The '"ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense"']; see [*People v.*] *Harris* (2008) 43 Cal.4th 1269, 1292 ['"Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance."']; accord, *People v. Mendoza* (2011) 52 Cal.4th 1056, 1090 [132 Cal.Rptr.3d 808, 263 P.3d 1].)" (*Contreras, supra,* 58 Cal.4th at p. 152.)

Martinez testified that when she was at Moreira's house the night before Moreira was shot, she heard the phone ring 14 times, and that Moreira answered five of the calls and ignored the other nine. In a sidebar discussion, defense counsel stated that she wanted to impeach Martinez's credibility with Martinez's statement to a police officer the morning of the shooting that "on the prior night the victim was on the phone constantly outside, and that he was busy storing guns in the top shelves of his bedroom, along with sorting out drugs." Defense counsel argued that "the statement that the night before the victim was on the phone constantly outside is inconsistent with her testimony here in court. The statement that the night before the victim was busy sorting out his drugs is inconsistent with her testimony that she removed nothing from the scene but the child. . . . [N]o drugs were found in the residence."[8] The trial court excluded the evidence.

---

[8]     Defendant does not provide a citation to the record for Martinez's purported testimony that she did not remove anything from the house following the shooting. As set forth above, the record does reflect that Martinez testified that she did not move anything inside the residence after the shooting and before the police arrived, although that testimony was given after the discussion concerning the admissibility of Martinez's statements to the police. Defendant may have been anticipating testimony based on testimony Martinez gave in defendant's first trial, which ended in a mistrial.

13

Later, defendant called Officer Luis Rodarte.  Prior to his testimony, defense counsel stated that she wanted to introduce Martinez's statement to Officer Rodarte that "on the prior night the victim was on the phone constantly outside and that he was busy storing guns in the top shelves of his bedroom along with sorting out drugs."  The trial court ruled that defense counsel could ask the officer about Martinez's statement concerning Moreira's phone usage the night before the shooting.  During Officer Rodarte's direct examination, defense counsel elicited testimony from him that Martinez told him that Moreira had been "on the phone constantly outside" the night before the shooting.  Thus, although the trial court did not permit defense counsel to ask Martinez about her statement to the police during her cross-examination, her statement ultimately was introduced through Officer Rodarte's testimony.  Accordingly, any restriction on defendant's right to cross-examine Martinez was harmless under *California v. Chapman, supra,* 386 U.S. at page 24.  (*People v. Livingston, supra,* 53 Cal.4th at p. 1159.)

The trial court did not permit defense counsel to examine Officer Rodarte about Martinez's statement to Officer Rodarte that Moreira was sorting out drugs the night before the shooting.  It ruled that the evidence was not "particularly relevant in this trial, either as a matter of proof or as impeachment."  The evidence was not relevant and the trial court did not err.  Martinez's testimony that she did not move anything inside the residence between the shooting and the arrival of the police was not inconsistent with her statement to the police that Moreira was sorting out drugs the night before the shooting.  Assuming that Moreira had drugs in his house the night before the shooting, Moreira or Martinez may have consumed, sold, or otherwise disposed of them *prior* to the shooting.  Nothing in Martinez's trial testimony or statement to Officer Rodarte suggested that Martinez removed any drugs from the residence between the shooting and the arrival of the police.  Accordingly, the trial court did not abuse its discretion or violate defendant's confrontation rights in excluding Martinez's statement to Officer Rodarte.  (*Contreras, supra,* 58 Cal.4th at p. 152.)

14

## IV.    The Trial Court's "Asymmetrical Evidentiary Rulings"

Defendant contends that the trial court made certain evidentiary rulings that "constituted asymmetrical evidentiary rulings in violation of [his] federal due process rights." Defendant's failure to object in the trial court on the ground asserted on appeal forfeited appellate review of the issue.

The failure to object in the trial court that the trial court's evidentiary rulings constituted "asymmetrical" evidentiary rulings in violation of the defendant's right to due process forfeits appellate review of that issue. (*People v. Blacksher* (2011) 52 Cal.4th 769, 842 [defendant forfeited his claim of "asymmetrical" application of the rules of evidence in violation of his due process rights for appellate purposes by failing to raise it below]; *People v. Halvorsen* (2007) 42 Cal.4th 379, 414 ["We concluded above that defendant preserved his related claim of state evidentiary error, but because the constitutional claims defendant now asserts do not simply restate his evidentiary claim on alternative legal principles, but instead require consideration of different circumstances— namely, the court's assertedly 'asymmetrical' treatment of the parties' use of hypothetical questions—he has forfeited the constitutional arguments for appeal"].)

Defendant contends that the trial court made erroneous and inconsistent rulings on his and the prosecutor's objections to the admission of certain evidence. Those rulings, defendant claims, constituted "asymmetrical" evidentiary rulings in violation of his federal due process rights. The trial court's asserted "asymmetrical" rulings are as follows:

1.    Over defendant's hearsay objection to proffered testimony, the trial court ruled that Martinez would be permitted to testify that Moreira told her that defendant was the person who made several phone calls to Moreira that Moreira did not answer. The trial court ruled that the evidence was admissible under the state of mind exception to the hearsay rule in Evidence Code section 1250 and as a "contemporaneous statement" under the hearsay exception in Evidence Code section 1241.

2.    The prosecutor asked Martinez why she did not want to look at a transcript that defense counsel showed her earlier in her testimony. Martinez responded, "I just did

15

not understand why." The prosecutor asked Martinez, "[W]hat's your state of mind right now . . . ?" Defense counsel objected on relevance grounds. The trial court overruled the objection. Martinez began to cry and said, "This is something that hurts me. And every time I come here, it's like they're killing—like I seen him covered in blood in the pictures. That's not something easy for me. I'm seeing him—" Defense counsel objected and moved to strike Martinez's testimony on the ground that "[t]his is improper." The trial court overruled the objection, and denied the motion to strike.

3. The prosecutor asked Martinez, "[A]s you sit here today, do you know who, in your opinion, who you heard through the window and later on shot Edgar Moreira?" Defense counsel objected that the question called for an improper conclusion. The trial court overruled the objection. Martinez answered, "Yes." The prosecutor asked Martinez, "And who did you hear outside that window?" Martinez responded, "To me, Bones, his official name is the defendant, Jose Delgado."

4. The prosecutor asked Detective Sawada the following hypothetical question, "If a younger member of the gang is being given an order by someone senior to him and the younger member of the gang doesn't do what he's asked to do, again, is that acceptable or tolerated?" Defense counsel objected that the question was an improper hypothetical question and called for speculation. The trial court overruled the objection. Detective Sawada responded, "No, it wouldn't be tolerated. It would be a sign of disrespect."

5. Defense counsel asked Detective Sawada the following hypothetical question, "Let's assume that someone receives a phone call of a shooting at 6:33 a.m. And let's assume that that person then makes 12 calls to one particular number . . . and thereafter calls 911 at approximately 7:57 a.m. [¶] Would you, as the gang expert, be suspicious as to why those phone calls were made prior to calling 911?" The prosecutor objected that the question was argumentative. The trial court sustained the objection on relevance grounds.

Defendant does not contend on appeal that the trial court's challenged evidentiary rulings constitute reversible error on state law grounds. Instead, defendant argues that the

16

rulings constituted "asymmetrical" evidentiary rulings in violation of his federal right to due process. Because defendant did not object in the trial court on that ground, he has forfeited appellate review of this issue. (*People v. Blacksher, supra,* 52 Cal.4th at p. 842; *People v. Halvorsen, supra,* 42 Cal.4th at p. 414.)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


MOSK, J.

We concur:


TURNER, P. J.


MINK, J.[*]


---

[*]    Retired Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.